**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**TOWER IV LLC OR ITS DESIGNEE**

**as Purchaser,**

**and**

**BJRP, LLC**

**as Seller**

**Dated as of November 16, 2018**

# TABLE OF CONTENTS

**Page**

## ARTICLE 1

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1 Purchase and Sale of Assets ................................................................. 2
1.2 Assumed Liabilities ............................................................................. 3
1.3 Excluded Liabilities ............................................................................. 3
1.4 Cure Costs ........................................................................................... 3
1.5 "As Is" Transaction ............................................................................. 3
1.6 Other Affiliates of Seller .................................................................... 4

## ARTICLE 2

## BANKRUPTCY COURT APPROVAL

2.1 Sale Motion ......................................................................................... 4
2.2 Entry of Order Approving Sale ........................................................... 5
2.3 Certain Bankruptcy Undertakings by Seller. ...................................... 6

## ARTICLE 3

## INSTRUMENTS OF TRANSFER AND ASSUMPTION

3.1 Transfer Documents ............................................................................ 7
3.2 Assignment and Assumption Documents ............................................ 7
3.3 Assignment and Assumption of Personal Property Leases
3.4 Assignment and Assumption of Real Property Leases. ....................... 7
3.5 Liquor Permit Transfer Documents. .................................................... 7

## ARTICLE 4

## CONSIDERATION; ALLOCATION

4.1 Consideration. ..................................................................................... 7
4.2 Allocation ............................................................................................ 8

## ARTICLE 5

## CLOSING

5.1 Closing ................................................................................................. 8
5.2 Closing Deliveries by Seller ............................................................... 8
5.3 Closing Deliveries by Purchaser ......................................................... 9

# ARTICLE 6

## REPRESENTATIONS AND WARRANTIES OF SELLER

| | | |
|---|---|---|
| 6.1 | Corporate Organization | 9 |
| 6.2 | Authority Relative to This Agreement | 10 |
| 6.3 | Conflicts; Consents of Third Parties | 10 |
| 6.4 | Litigation | 10 |
| 6.5 | Intellectual Property | 11 |
| 6.6 | Permits | 11 |
| 6.7 | Brokers and Finders | 11 |
| 6.8 | Title to Assets; Condition of Assets; Indebtedness | 11 |
| 6.9 | Contracts | 12 |
| 6.10 | Real Property | 12 |
| 6.11 | Tangible Personal Property | 12 |
| 6.12 | Environmental Health and Safety Matters | 12 |
| 6.13 | Compliance with Law | 12 |
| 6.14 | Employees; Employee Benefits | 12 |
| 6.15 | Insurance Policies | 14 |
| 6.16 | Tax Matters | 14 |
| 6.17 | Vendors | 14 |
| 6.18 | Transactions with Directors, Officers and Members | 14 |
| 6.19 | Purchaser is a Good Faith Purchaser | 15 |

# ARTICLE 7

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

| | | |
|---|---|---|
| 7.1 | Organization | 15 |
| 7.2 | Authority Relative to This Agreement | 15 |
| 7.3 | Consents and Approvals; No Violation | 15 |
| 7.4 | Brokers and Finders | 16 |
| 7.5 | Independent Investigation | 16 |

# ARTICLE 8

| | | |
|---|---|---|
| 8.1 | Employees | 16 |
| 8.2 | Further Assurances | 16 |

# ARTICLE 9

## COVENANTS AND AGREEMENTS

| | | |
|---|---|---|
| 9.1 | Further Agreements | 17 |
| 9.2 | Preservation of Records; Post-Closing Access to Information | 17 |
| 9.3 | Publicity | 18 |
| 9.4 | Further Assurances | 18 |

18-15839-aih    Doc 47-1    FILED 11/16/18    ENTERED 11/16/18 17:26:50    Page 3 of 68

## ARTICLE 10

## CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATION TO CLOSE

10.1   Accuracy of Representations and Warranties; Performance of this Agreement............... 19
10.2   Officer's Certificate ................................................................................................... 19
10.3   Document Deliveries .................................................................................................. 19
10.4   Bankruptcy Matters.................................................................................................... 19
10.5   Required Consents ...................................................................................................... 19
10.6   No Material Adverse Effect ....................................................................................... 19

## ARTICLE 11

## CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE

11.1   Accuracy of Representations and Warranties; Performance of this Agreement............... 19
11.2   Authorizing Resolutions ............................................................................................ 20
11.3   Document Deliveries .................................................................................................. 20
11.4   Bankruptcy Matters.................................................................................................... 20

## ARTICLE 12

## TERMINATION

12.1   Breaches and Defaults; Opportunity to Cure ............................................................. 20
12.2   Termination................................................................................................................ 20
12.3   Effect of Termination ................................................................................................ 21

## ARTICLE 13

## DEFINITIONS

13.1   Certain Definitions..................................................................................................... 22
13.2   Additional Defined Terms ......................................................................................... 28

## ARTICLE 14

## MISCELLANEOUS

14.1   Expenses .................................................................................................................... 30
14.2   Gift Cards................................................................................................................... 30
14.3   Non-Disparagement ................................................................................................... 30
14.4   [Reserved] .................................................................................................................. 30
14.5   Survival of Representations and Warranties; Survival of Post-Closing Covenants Cap on Liability...................................................................................................................... 30
14.6   Entire Agreement; Amendments and Waivers ........................................................... 30
14.7   Counterparts ............................................................................................................... 31
14.8   Governing Law .......................................................................................................... 31

18-15839-aih     Doc 47-1     FILED 11/16/18     ENTERED 11/16/18 17:26:50     Page 4 of 68

14.9    Jurisdiction, Waiver of Jury Trial ................................................................. 31
14.10   Notices ............................................................................................................ 31
14.11   Binding Effect; Assignment ........................................................................... 32
14.12   Severability .................................................................................................... 32
14.13   Injunctive Relief ............................................................................................. 33
14.14   Third Party Beneficiaries ............................................................................... 33
14.15   Section 363(b)(1)(A) ...................................................................................... 33
14.16   Certain Interpretations ................................................................................... 33

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (as amended, supplemented or otherwise modified from time to time and including all Schedules and Exhibits, this "Agreement"), dated as of November 16, 2018 (the "Original Execution Date") by and between (i) TOWER IV LLC, an Ohio limited liability company, or its designee ("Purchaser") and (ii) BJRP, LLC, as Debtor and Debtor-in-Possession ("Seller") under Case No. 18-15839-AIH (the "Bankruptcy Case") in the United States Bankruptcy Court for the Northern District of Ohio (the "Bankruptcy Court"). ARTICLE 13 contains definitions of certain capitalized terms used herein and also provides cross-references to certain capitalized terms defined elsewhere in this Agreement.

## RECITALS

A.  On September 28, 2018 (the "Petition Date"), Seller commenced the Bankruptcy Case by filing a voluntary petition for relief under Chapter 11 Bankruptcy Code with the Bankruptcy Court.

B.  Seller is engaged in the fine dining restaurant business located at 3355 Richmond Road in Beachwood, Ohio 44122 under the names "Red, the Steakhouse" and "Moxie, the Restaurant" (the "Business"), and Purchaser desires to purchase certain assets used in the operation of the Business and assume certain liabilities related thereto.

C.  BJRP is indebted to Tower based on the following: (i) the Promissory Note from BJRP payable to the order of Tower (through an assignment) in the face amount of One Million Seven Hundred Thousand Dollars ($1,700,000) dated July 1, 2009, (ii) the Promissory Note from BJRP payable to the order of Tower (through an assignment) in the face amount of One Million Dollars ($1,000,000) dated July 25, 2011, and (iii) the Promissory Note from BJRP payable to Tower (through an assignment) in the face amount of Thirty-Five Thousand Dollars ($35,000) dated May 28, 2009 (collectively, the "Notes"). As of the Petition Date, the principal and interest amount due on the Notes is Nine Hundred Eighty-Four Thousand And One Hundred Twenty-Six Dollars ($984,126) (consisting of $963,263 in principal and $20,863 in interest), plus accrued and accruing interest, fees, costs, expenses, and other charges (the "Pre-Petition Indebtedness").

D.  On October 5, 2018, the Bankruptcy Court entered an Interim Order Authorizing Debtor To: (A) Use Cash Collateral On An Emergency Basis Pending A Final Hearing; (B) Incur Postpetition Debt On An Emergency Basis Pending A Final Hearing; And (C) Grant Adequate Protection And Provide Security And Other Relief To Tower IV LLC (Doc. No. 19) (the "Interim Cash Collateral and DIP Order"). On October 31, 2018, the Bankruptcy Court entered a Final Order Authorizing Debtor To: (A) Use Cash Collateral; (B) Incur Postpetition Debt; And (C) Grant Adequate Protection And Provide Security And Other Relief To Tower IV LLC (Doc. No. 42) (the "Final Cash Collateral and DIP Order"). Pursuant to the Interim Cash Collateral and DIP Order and Final Cash Collateral and DIP Order, Tower made an additional advancement of $80,000 under the Notes to the Debtor and, under certain circumstances and in its sole discretion, may make an additional advance of $20,000 (in the aggregate, the "Post-Petition Indebtedness" and, together with the Prepetition Indebtedness, the "Total Indebtedness").

18-15839-aih    Doc 47-1    FILED 11/16/18    ENTERED 11/16/18 17:26:50    Page 6 of 68

E.     Seller wishes to sell, transfer, convey, assign and deliver to Purchaser, in accordance with Sections 363 and 365 and the other applicable provisions of the Bankruptcy Code, all of the Purchased Assets (defined below), together with the Assumed Liabilities of Seller (defined below), a transfer of Seller's Liquor Permit and the assignment of the Assumed Agreements upon the terms and subject to the conditions set forth in this Agreement (hereinafter collectively referred to as the "<u>Transaction</u>").

F.     Purchaser wishes to purchase and take delivery of such Purchased Assets and Assumed Liabilities upon such terms and subject to such conditions as provided in this Agreement.

G.     The Purchased Assets will be sold pursuant to a sale order of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code (the "<u>Sale Order</u>") and such Sale Order will include the assumption and assignment of the Assumed Agreements under Section 365 of the Bankruptcy Code and pursuant to the terms and conditions of this Agreement.

H.     All of the obligations of the parties under this Agreement are conditioned upon the approval of the Bankruptcy Court in accordance with Article 3 hereof.

I.     Purchaser desires to purchase and assume from Seller, and Seller desires to sell, transfer and assign to Purchaser, the Purchased Assets free and clear from all Encumbrances, except for the Permitted Encumbrances set forth herein, and the Assumed Liabilities in accordance with this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Purchaser and Seller hereby agree as follows:

## ARTICLE 1

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1     <u>Purchase and Sale of Assets</u>.

(a)     *Purchased Assets.*  Pursuant to the terms and subject to the conditions set forth in this Agreement and subject to Bankruptcy Court approval, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser, on the Closing Date, all of Seller's right, title and interest in, to and under, free and clear of all Encumbrances (other than Permitted Encumbrances), all of Seller's assets, properties, rights and interests of any nature whatsoever, but subject to Section 1.1(c), excluding those assets identified as "<u>Excluded Assets</u>" in <u>Section 1.1(b)</u>, but including, but not limited to, those assets set forth on <u>Schedule 1.1(a)</u> attached hereto (the "<u>Purchased Assets</u>");

(b)     *Excluded Assets.*  Notwithstanding anything to the contrary in this Agreement or any of the Ancillary Agreements, in no event shall Seller be deemed to sell, transfer, assign or convey, and Seller shall retain all of its right, title and interest to, in and under, all of its assets, properties, rights and interests, other than the Purchased Assets, including as set forth on <u>Schedule 1.1(b)</u> attached hereto (collectively, the "<u>Excluded Assets</u>"); and

(c)     *Assumed Agreements*.  With respect to Personal Property Leases, Real Property Leases, and Contracts, Purchaser shall have the right, in its sole and absolute discretion, to elect to assume certain Real Property Leases (the "Assumed Real Property Leases"), certain Personal Property Leases (the "Assumed Personal Property Leases") and certain Contracts (the "Assumed Contracts") as identified by Purchaser.  Purchaser shall identify all Real Property Leases, Personal Property Leases and Contracts to be assumed by Seller and assigned to Purchaser prior to Closing by listing such agreements on Schedule 1.1(c).  Notwithstanding the foregoing, Purchaser shall have up to 60 days after Closing to elect, in its sole discretion, to assume a certain Contract (and to identify it as an Assumed Contract) between Seller and Red South Beach, LLC related to Seller's license of intellectual property to allow the use of the trademark or tradename "Red," or "Red, the Steakhouse" at the Red South Beach restaurant in Miami, Florida or any other location (the "Red SB License Agreement").

1.2     Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement, effective as of the Closing, Purchaser shall assume and discharge when due only the following Liabilities to the extent not previously performed or discharged, and no others: (i) all Liabilities which first accrue and are to be performed from and after the Closing under the Assumed Agreements, which relate to periods of time on or after the Closing Date, (ii) Liabilities and obligations relating to and arising from Purchaser's operation of the Purchased Assets after the Closing Date and (iii) other Liabilities (if any) as set forth on Schedule 1.2 attached hereto (items (i), (ii) and (iii) are collectively referred to herein, but in all cases excluding the Excluded Liabilities, as the "Assumed Liabilities").

1.3     Excluded Liabilities.  Except for the Assumed Liabilities (which shall, in no event, be Excluded Liabilities), Purchaser shall not assume, or become liable for the payment or performance of, any Liabilities of Seller of any nature whatsoever, whether accrued or unaccrued (collectively, the "Excluded Liabilities"), including, without limitation, the Liabilities set forth on Schedule 1.3, all of which shall remain Liabilities of Seller.

1.4     Cure Costs.  The Assumed Agreements shall be assumed by Seller and assigned to Purchaser in accordance with the requirements of Section 365 of the Bankruptcy Code, and Seller shall be obligated to pay, on the Closing Date, all amounts needed to cure any defaults to the extent such defaults are required to be cured and such cure amounts are required to be paid as a condition to assumption and assignment of the Assumed Agreements ("Cure Costs").  Purchaser may amend the Schedules setting forth the Purchased Assets and the Excluded Assets attached hereto at any time prior to Closing, provided, that such exclusion shall not serve to reduce or otherwise affect the Cash Bid Amount.

1.5     "As Is" Transaction.  PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE 6 OF THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, EITHER WRITTEN OR ORAL, WITH RESPECT TO SELLER, THE BUSINESS, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR ANY OTHER MATTER.  WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS.  ACCORDINGLY, EXCEPT AS OTHERWISE

18-15839-aih    Doc 47-1    FILED 11/16/18    ENTERED 11/16/18 17:26:50    Page 8 of 68

EXPRESSLY PROVIDED IN ARTICLE 6 OF THIS AGREEMENT, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

1.6     Other Affiliates of Seller.  The Purchased Assets do not include any assets, properties, rights or interests that are not owned by Seller and in no event include any assets, properties, rights or interests owned by any other Affiliate of Seller.

## ARTICLE 2

## BANKRUPTCY COURT APPROVAL

2.1     Sale Motion.  No later than one (1) business day after execution of the Purchase Agreement by the parties hereto, Seller shall file a motion in form and substance reasonably satisfactory to Purchaser (the "Sale Motion") with the Bankruptcy Court seeking entry of the Sale Order in form and substance reasonably satisfactory to Purchaser by no later than December 21, 2018, or such other date as agreed to by the parties.  The Sale Motion shall provide for an "Alternative Transaction" that includes the following provisions:

(a)     Competing offers (the "Qualified Bid(s)") to acquire the Purchased Assets shall:

(i)     be submitted in writing to Seller and Purchaser and their respective counsel on or before 5:00 p.m. (Eastern Time) on December 11, 2018 (the "Bid Deadline");

(ii)     provide for a purchase price to be made in immediately available funds (cash or wire transfer) and paid to Seller that exceeds the Consideration (defined in Section 4.1) by at least One Hundred Thousand Dollars ($100,000);

(iii)     be accompanied by a signed asset purchase agreement in form and substance substantially similar to the Purchase Agreement, together with a redlined, marked copy showing all changes to the Purchase Agreement (the "Competing Agreement");

(iv)     be non-contingent;

(v)     not be subject to other conditions beyond those imposed by Purchaser;

(vi)     remain open until the entry of the Sale Order;

(vii)     contain terms and conditions no less favorable to Seller than the terms and conditions of the Purchase Agreement;

(viii)     be accompanied by evidence to the Seller's reasonable satisfaction establishing that the bidder is capable and qualified, financially, legally, and otherwise, of unconditionally performing all obligations under the Competing Agreement;

(ix)	be accompanied by a cashier's check or other good funds made payable to the order of Seller in an amount of One Hundred Thousand Dollars ($100,000) (the "Overbidder's Deposit"), and further provide that (A) if the Bankruptcy Court approves a sale of the Purchased Assets to that bidder, Seller may retain the Overbidder's Deposit, and (B) if the Bankruptcy Court does not approve a sale of the Purchased Assets to that bidder, Seller will promptly return the Overbidder's Deposit to such bidder;

(x)	be for substantially all of the Purchased Assets; and

(xi)	include a provision that any Cure Costs are final and binding upon the applicable counterparty and Seller is authorized to pay such Cure Costs directly from the sale proceeds.

(b)	If no timely conforming Qualified Bids are submitted, Seller shall request at the Sale Hearing that the Court approve the proposed sale of the Purchased Assets to Purchaser under the Purchase Agreement.

(c)	The Sale Motion shall provide for the rejection of certain of the Seller's license agreements for the use of the trademark or tradename "Red," or "Red, the Steakhouse" (the "Red License Agreements") under Section 365 of the Bankruptcy Code as designated by Purchaser.

2.2	Entry of Order Approving Sale.

(a)	In the event there are no Qualified Bids, then Seller shall use its reasonable best efforts to obtain entry of the Sale Order at the Sale Hearing.  The Sale Order shall be in accordance with the terms of the Purchase Agreement, shall be in a form reasonably satisfactory to Purchaser and Seller, and shall, among other things:

(i)	approve and direct the sale and assignment of the Purchased Assets to Purchaser and approve and direct the assumption and assignment of the Assumed Agreements to Purchaser free and clear of all Liens, claims or interests, based on appropriate findings and rulings pursuant to, inter alia, Sections 363(b), (f) and (m) and 365 of the Bankruptcy Code, including but not limited to Sections 365(h), (i), (l) and (n) and the release of Purchaser of any rights otherwise associated with, and which may otherwise be to the benefit of, any third parties;

(ii)	include a finding that Purchaser is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code;

(iii)	include a finding that Purchaser is not deemed to be a successor to Seller, to have, *de facto* or otherwise, merged with or into Seller or to be a mere continuation of Seller;

(iv)	include a finding that the Consideration is a fair and reasonable price for the Purchased Assets;

(v)	include a finding confirming the adequacy of notice to all creditors and parties in interest and parties to any executory contract, unexpired lease or right of entry;

18-15839-aih	Doc 47-1	FILED 11/16/18	ENTERED 11/16/18 17:26:50	Page 10 of 68

(vi)     include provisions for the retention of jurisdiction in the Bankruptcy Court over matters relating to the transactions contemplated in the Agreement including matters relating to title to the Purchased Assets and claims against the Purchased Assets which arose or were based on facts or occurrences prior to the Closing.  Furthermore, the Sale Order shall not have been reversed, stayed, modified or amended;

(vii)     include a provision authorizing the transfer of Seller's Liquor Permit to Purchaser and requiring Seller and its principals, managing members and officers, as the case may require, to cooperation with Purchaser in the transfer of the Seller's Liquor Permit, including but not limited to keeping Seller's vendor's license in place until Seller's Liquor Permit has been transferred to Purchaser, working cooperatively with Purchaser to report sales under Seller's vendor's license until Seller's Liquor Permit has been transferred to Purchaser and obtaining from the Ohio Department of Taxation a sales tax clearance certificate (which cannot be requested or issued until after Seller's Liquor Permit has been transferred to Purchaser);

(viii)     include a provision authorizing the assumption, under Section 365 of the Bankruptcy Code, by Seller and the assignment to Purchaser of the Assumed Agreements;

(ix)     include a provision authorizing the rejection of the Red License Agreements under Section 365 of the Bankruptcy Code, provided, that such agreements are not assumed by Seller and assigned to Purchaser under this Agreement or otherwise; and

(x)     include a provision authorizing and directing Seller to promptly file 60 days after Closing, a motion under Section 365 of the Bankruptcy Code, seeking the rejection of the Red SB License Agreement if such agreement is not assumed by Seller and assigned to Purchaser under this Agreement or otherwise.

(b)     Seller shall provide notice of any hearing on the motion to approve the Sale Order or any other matter before the Bankruptcy Court relating to this Agreement, the Seller Ancillary Agreements, or Purchaser Ancillary Agreements, in each case as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Northern District of Ohio or as otherwise ordered by the Bankruptcy Court.

2.3     <u>Certain Bankruptcy Undertakings by Seller.</u>

(a)     In accordance with Section 2.1, Seller shall file the Sale Motion.  Except as ordered by the Bankruptcy Court, Seller shall neither take any action, nor fail to take any action, which action or failure to act would (i) reasonably be expected to prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms of this Agreement; or (ii) result in (A) the reversal, avoidance, revocation, vacating or modification (in any manner that would reasonably be expected to materially and adversely affect Purchaser's rights hereunder), or (B) the entry of a stay pending appeal.

(b)     If Sale Order or any other order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), Seller, with the cooperation and support of Purchaser, shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion, and shall endeavor to obtain an expedited resolution of such appeal.

(c)     To the extent Seller decides to reject a Contract in the Bankruptcy Case, Seller shall first seek input from Purchaser to determine if Purchaser desires to take assignment of such Contract, subject to assumption by Seller under Section 365 of the Bankruptcy Code and approval from the Bankruptcy Court.

## ARTICLE 3

## INSTRUMENTS OF TRANSFER AND ASSUMPTION

3.1     Transfer Documents.  At the Closing, Seller will deliver to Purchaser (a) one or more Bills of Sale in substantially the form attached hereto as Exhibit A (the "Bill of Sale"), and (b) all such other good and sufficient instruments of sale, transfer and conveyance consistent with the terms and provisions of this Agreement, including, without limitation, the Purchased Assets, and any other assignments as shall be reasonably necessary to vest in Purchaser all of Seller's right and title to, and interest in, the Purchased Assets.

3.2     Assignment and Assumption Documents.  At the Closing, Purchaser and Seller will execute and deliver an Assignment and Assumption Agreement in substantially the form attached hereto as Exhibit B (the "Assumption Agreement") in order to effect the assignment and assumption of the Assumed Liabilities.

3.3     Assignment and Assumption of Personal Property Leases.  At the Closing, Purchaser and Seller will execute and deliver an Assignment and Assumption Agreement in substantially the form attached hereto as Exhibit C (the "Assumption of Personal Property Leases") in order to effect the assignment and assumption of the Personal Property Leases.

3.4     Assignment and Assumption of Real Property Leases.  At the Closing, Purchaser and Seller will execute and deliver an Assignment and Assumption Agreement in substantially the form attached hereto as Exhibit D (the "Assumption of Real Property Leases") in order to effect the assignment and assumption of the Real Property Leases.

3.5     Liquor Permit Transfer Documents.  At the Closing, Purchaser and Seller will execute and deliver an Application for Transfer of Ownership of Seller's Liquor Permit and such other transfer documents as may be required to effectuate the transfer of Seller's Liquor Permit to Purchaser (collectively the "Liquor Permit Transfer Documents"). Further, Purchaser and Seller will execute and deliver an Interim Beverage Management Agreement in substantially the form attached hereto as Exhibit E (the "Interim Beverage Management Agreement") in order for Purchaser to operate its business at location of the Business pending the transfer of Seller's Liquor Permit to Purchaser.

## ARTICLE 4

## CONSIDERATION; ALLOCATION

4.1     Consideration.

In exchange for the sale, assignment, transfer, conveyance and delivery from Seller of the Purchased Assets, Purchaser shall provide up to Eight Hundred Fifty Thousand Dollars ($850,000) of consideration (the "Consideration"), consisting of:

(a)     A credit bid in the amount of Seven Hundred Fifty Thousand Dollars ($750,000) (the "Credit Bid Amount"); provided, that if there is a Qualified Bid, Purchaser may, in its sole discretion, increase the Credit Bid Amount by (i) up to the full amount of the Pre-Petition Indebtedness, and (ii) up to the full amount of the Post-Petition Indebtedness plus applicable interest, fees, costs and other charges;

(b)     After Closing, Purchaser will make the Cash on Hand Amount available to the extent necessary for payment of the following costs: (i) allowed PACA claims of Premier Produce, Inc., if any; (ii) allowed trade vendor claims arising after the Petition Date; (iii) Cure Costs other than for the Assumed Real Property Leases; (iv) Seller's United States Trustee's fees accruing through Closing; (v) Prepetition Sales Taxes; (vi) professional fees and expenses of Seller's counsel retained under Order Granting Application to Employ (Doc. No. 35), and which are approved by the Bankruptcy Court; and (vii) Seller's obligations to pay Employees payroll wages and related payroll taxes (collectively, the "Seller Costs");

(c)     To the extent that the Cash on Hand Amount is less than the Seller Costs, Purchaser will pay Seller up to an additional One Hundred Thousand Dollars ($100,000) (the "Cash Bid Amount") to cover the deficiency, if any; and

(d)     Payment of Cure Costs for the Assumed Real Property Leases pursuant to an agreement between Purchaser and the counterparty or counterparties to the Assumed Real Property Leases, or otherwise pursuant to an order from the Bankruptcy Court.

4.2     Allocation.   Within ninety (90) days following the Closing, Purchaser shall deliver to Seller a statement allocating the Consideration among the Purchased Assets in accordance with Section 1060 of the Code.

# ARTICLE 5

# CLOSING

5.1     Closing.   The closing of the transactions contemplated by this Agreement (the "Closing") shall take place on January 11, 2019 at the offices of Ulmer & Berne LLP, 1660 W. 2nd St., Suite 1100, Cleveland, Ohio 44113 (or at such other place as the parties may mutually designate in writing). The date on which the Closing is held is referred to in this Agreement as the "Closing Date," and the Closing will be deemed to be effective as of 12:01 am Cleveland, Ohio local time on the Closing Date.

5.2     Closing Deliveries by Seller.   At the Closing, Seller shall deliver or cause to be delivered:

(a)     to Purchaser, a duly executed Bill of Sale and Assumption Agreement, with respect to (i) conveyances by Seller of the Purchased Assets to Purchaser and (ii) the assignment by Seller and the assumption by Purchaser of the Assumed Liabilities;

(b)     to Purchaser, certificates executed by Seller in accordance with Treasury Regulation Section 1.1445-2(b)(ii) to the effect that Seller is not a "foreign person" within the meaning of the Code section 1445 or successor statute;

(c)     to Purchaser, all Seller Ancillary Agreements to be delivered by Seller at or prior to the Closing in connection with the transactions contemplated by this Agreement, including without limitation, the Assignment of Personal Property Leases, the Assignment of Real Property Leases, the Liquor Permit Transfer Documents and the Interim Beverage Management Agreement;

(d)     to Purchaser, any additional documents and/or materials that Purchaser reasonably requests in connection with this sale transaction.

5.3     <u>Closing Deliveries by Purchaser</u>.  At the Closing, Purchaser shall deliver or cause to be delivered:

(a)     to Seller, an amount equal to the Cash Bid Amount, by wire transfer of immediately available funds to the account of Seller in accordance with written wire instructions delivered by Seller to Purchaser on or prior to the Closing Date, <u>provided that</u> Seller is transferring to Purchaser all of the Purchased Assets;

(b)     to Seller, a duly executed bill of sale and Assignment and Assumption Agreement, with respect to (i) conveyances by Seller of the Purchased Assets to Purchaser and (ii) the assignment by Seller and the assumption by Purchaser of the Assumed Liabilities;

(c)     to Seller, all Purchaser Ancillary Agreements to be delivered by Purchaser at or prior to the Closing in connection with the transactions contemplated by this Agreement;

(d)     to Seller, a statement indicating the remaining balance of the Total Indebtedness, if any, reduced by the Credit Bid Amount; and

(e)     to Seller, any additional documents and/or materials that Seller reasonably requests in connection with this sale transaction;

## ARTICLE 6

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Seller Disclosure Schedules, Seller hereby makes the representations and warranties in this <u>Article 6</u> to Purchaser as of the Original Execution Date and as of the Closing Date.

6.1     <u>Company Organization</u>.  Seller is a limited liability company, duly organized, validly existing and in good standing under the Laws of the State of Ohio.  Seller has all requisite power and authority to own, operate and, subject to order of the Bankruptcy Court, assign and convey the Purchased Assets and to conduct the Business as it is now being operated.  Seller is duly licensed or qualified and in good standing to do business in the State of Ohio.

18-15839-aih    Doc 47-1    FILED 11/16/18    ENTERED 11/16/18 17:26:50    Page 14 of 68

6.2     Authority Relative to This Agreement.  Subject to order of the Bankruptcy Court, Seller has all requisite company power, authority and legal capacity to (a) execute and deliver this Agreement, (b) execute and deliver the Seller Ancillary Agreements to which it is a party, and (c) perform its obligations hereunder and under each of the Seller Ancillary Agreements to which it is a party, and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and each of the Seller Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on the part of Seller.  This Agreement and each Seller Ancillary Agreement has been duly and validly executed and delivered by Seller, and this Agreement constitutes, and each Seller Ancillary Agreement, when so executed and delivered, will constitute, legal, valid and binding obligations of the Seller, enforceable against Seller in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Law or in equity).

6.3     Conflicts; Consents of Third Parties.

(a)     Neither the execution and delivery of this Agreement or any of the Ancillary Agreements by Seller, nor the consummation of the transactions contemplated hereby or thereby, nor compliance by Seller with any of the terms or provisions hereof or thereof, will (i) conflict with or result in a breach of any provision of the charter documents, operating agreement or other governing document of Seller, (ii) conflict with or result in a breach of any Law applicable to Seller, (iii) conflict with, violate, result in the breach or termination of or the loss of a benefit under, or constitute (with or without notice or lapse of time or both) a default (or give rise to any right of termination, cancellation, payment or acceleration) or adverse modification of any terms or rights under, any Contract or Permit, or (iv) result in any Encumbrance (other than Permitted Encumbrances) on any of the Purchased Assets.

(b)     No consent, approval, license, permit, order, qualification or authorization of, or registration, declaration, notice or filing with, any Governmental Body or any other Person is required for or in connection with the execution and delivery by Seller of this Agreement and each Ancillary Agreement, and the consummation by Seller of the transactions contemplated hereby and thereby, other than approval of the transfer of the Seller's Liquor Permit as contemplated in this Agreement and in the Interim Beverage Management Agreement.

6.4     Litigation.  Other than the Bankruptcy Case, there is no litigation, action, claim, suit, proceeding, investigation, examination, hearing, arbitration, inquiry, subpoena or audit, whether in law or equity, or whether civil, criminal, regulatory, arbitral or administrative related to the Purchased Assets (collectively, "Actions"), pending or, to the Knowledge of Seller, threatened.  Seller is not subject to any judgment, decree, injunction, subpoena, order, ruling, writ, assessment or award of any court, arbitration panel or other Governmental Body that relates to the Purchased Assets or the Assumed Liabilities and for which Seller has continuing obligations or Liabilities.

6.5 <u>Intellectual Property</u>.

(a) <u>Schedule 6.5(a)</u> of the Seller Disclosure Schedules sets forth a true, complete and correct list of (i) all of the patents, registered trademarks, registered copyrights, Internet domain names, and applications for any of the foregoing, in each case that constitute the Seller Intellectual Property ("<u>Registered IP</u>"), and (ii) all software included in the Seller Intellectual Property; and (iii) all infringement causes of action that Seller has initiated against third parties. To the Knowledge of Seller, Seller has not infringed, misappropriated or otherwise violated any Intellectual Property right of any other Person. To the Knowledge of Seller, (x) no Registered IP has been adjudged invalid or unenforceable in whole or in part, and (y) all Registered IP is valid and enforceable.

(b) The Intellectual Property set forth on <u>Schedule 6.5(a)</u> of the Seller Disclosure Schedules constitutes all of the Intellectual Property used by the Seller in the Business.

6.6 <u>Permits</u>.

(a) All of the Permits that are (i) required for the ownership or use of the Purchased Assets, and (ii) for the operation of the Business (collectively, the "<u>Permits</u>") are held by Seller and in full force and effect. Each such Permit is listed in <u>Schedule 6.6(a)</u> of the Seller Disclosure Schedules.

(b) (i) Seller is in compliance with its obligations under each of the Permits and the rules and regulations of the Governmental Body issuing such Permits, and (ii) to the Knowledge of Seller, no condition exists that with notice or lapse of time or both would constitute a default under, or a violation of, any Permit.

(c) There is no pending, or to the Knowledge of Seller threatened, action, investigation or proceeding with respect to revocation, cancellation, suspension or nonrenewal of any such Permit. Seller has not received any written notice from any Governmental Body (i) asserting the violation of the terms of any such Permit, (ii) threatening to revoke, cancel, suspend or not renew the terms of any such Permit, or (iii) seeking to impose fines, penalties or other sanctions for violation of the terms of any such Permit.

6.7 <u>Brokers and Finders</u>. Seller has not employed, and no other Person has made any arrangement by or on behalf of Seller with, any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which could give rise to any claim against Purchaser for any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

6.8 <u>Title to Assets</u>. To the best of Seller's Knowledge, Seller possesses good and marketable title to the Purchased Assets and has the right to use all of the Purchased Assets. The Purchased Assets together with the Excluded Assets and Purchaser's rights under the Interim Beverage Management Agreement constitute all of the assets, properties and rights, whether tangible or intangible necessary for the conduct of the Business as currently conducted. At the

Closing, Purchaser shall receive good, valid and marketable title to the Purchased Assets free and clear of all Encumbrances (except Permitted Encumbrances).

6.9     Contracts.  Each Contract is valid, binding and enforceable against the Seller and, to the Knowledge of Seller, is valid, binding and enforceable against the other party thereto. Other than the Cure Costs, there is no material default by Seller under any Contract and, to the Knowledge of Seller, no event has occurred which, with due notice or lapse of time or both, would constitute such a default.  To the Knowledge of Seller, (i) no other party to any Contract is in material default in respect thereof and (ii) no event has occurred which, with due notice or lapse of time or both, would constitute such a default.

6.10     Real Property.   Schedule 6.10 of the Seller Disclosure Schedules sets forth a description of the Real Property Leases.  Seller has a valid and enforceable leasehold interest under the Real Property Leases under which it is a lessee, free and clear of all Liens of any nature whatsoever except Permitted Encumbrances.

6.11     Tangible Personal Property.   Schedule 6.11 of the Seller Disclosure Schedules sets forth a complete and correct list of the Personal Property Leases.  Seller has a valid and enforceable leasehold interest under each Personal Property Lease under which it is a lessee.

6.12     Environmental Health and Safety Matters.  To the Seller's Knowledge, Seller, the Leased Real Property, and the Business are in material compliance with all Environmental, Health and Safety Requirements.  To the Seller's Knowledge, there are no existing liabilities, claims, investigations, notices of violation or notices of any liability with respect to the Seller, the Business or the Leased Real Property, nor are the Seller, the Business or the Leased Real Property the subject of any investigation or inquiry arising under Environmental, Health and Safety Requirements, including any investigatory, remedial or corrective obligation, the subject of which is unresolved.

6.13     Compliance with Law.  Seller: (i) is in compliance with all applicable Laws relating to the Purchased Assets, (ii) has not received notice of any alleged violation of any Law applicable to the Purchased Assets or the Business, and (iii) is not subject to, or in default in any respect with, any order of any Governmental Body applicable to the Purchased Assets or the transactions contemplated under this Agreement.  To the Knowledge of Seller, no investigations, inquiries or reviews by any Governmental Body with respect to the Purchased Assets, the Seller or the Business have been commenced.

6.14     Employees; Employee Benefits.

(a)     Schedule 6.14(a) of the Seller Disclosure Schedules sets forth a true and complete list of individuals that are currently employed by Seller in the Business ("Employees"), including name, title, date of hire, current base salary or wage rate, position, and title.

(b)     Seller is not a party to any labor or collective bargaining agreement that covers any Employees or former employees.  To the Knowledge of Seller, there are no union organizing activities pending or overtly threatened with respect to the Employees (or former employees).  There are no strikes, lockouts or other material labor disputes pending or, to the Knowledge of Seller, overtly threatened by or with respect to any Employees (or former

employees). Seller has complied in all respects with applicable Laws regarding the employment of employees.

(c)     Schedule 6.14(c) of the Seller Disclosure Schedules sets forth a list of all of the material pension, retirement, profit-sharing, deferred compensation, equity compensation, severance, change in control, vacation, medical, dental, disability, life insurance, bonus or other plans, programs, arrangements or agreements (including all "employee benefit plans" as that term is defined in Section 3(3) of ERISA) maintained, sponsored or contributed to by Seller or any of its Affiliates for the benefit of the Employees (or any former employees) or any beneficiary or dependent thereof (collectively, the "Benefit Plans").

(d)     Except for the 401K Plan, Seller does not (i) maintain, contribute to or participate in, and has not incurred any liability with respect to, any employee benefit plan that is subject to Title IV of ERISA, Code Section 412, or ERISA Section 302, or (ii) participate in or contribute to, and has not incurred any liability with respect to, a multiemployer plan within the meaning of Section 3(37) of ERISA. Except for the 401K Plan, no Benefit Plan is (i) a voluntary employees' beneficiary association within the meaning of Code Section 501(c)(9), or (ii) a self-insured group health or other group welfare plan.

(e)     Each of the Benefit Plans intended to be "qualified" within the meaning of Code Sections 401(a) or 501 has received a favorable determination letter or may rely on a favorable opinion letter as to such plan's qualified status, and, to the Knowledge of Seller, no circumstances exist that would reasonably be expected to result in the revocation of any such letter. Each of the Benefit Plans has been (i) administered in compliance with its terms in all respects and (ii) maintained in accordance with ERISA, the Code and any other applicable Laws.

(f)     With respect to each Benefit Plan: (i) no Actions are pending, or, to the Knowledge of Seller, threatened; (ii) no audits, inquiries, reviews, proceedings, claims, or demands are pending with any Governmental Body; (iii) all material premiums, contributions, or other payments required to have been made under the terms of any Benefit Plan or any contract or agreement relating thereto as of the Closing Date have been made; and (iv) all material reports, returns and similar documents required to be distributed to any plan participant have been duly and timely distributed.

(g)     No Benefit Plan provides for medical or death benefits with respect to any employee or former employee of Seller or any of its predecessors after termination of employment, except as required under Section 4980B of the Code or Part 4 of Title I of ERISA or other applicable Laws.

(h)     Except as otherwise expressly contemplated by the terms of this Agreement, to the Knowledge of Seller, the consummation of the transactions contemplated by this Agreement shall not give rise to any material liability under any Benefit Plan, or accelerate the time of payment or vesting or increase the amount of compensation or benefits due to any employee, director or independent contractor of Seller (whether current, former or retired) or their beneficiaries solely by reason of such transactions.

6.15    Insurance Policies.  Schedule 6.15 of the Seller Disclosure Schedules sets forth a complete list of all insurance policies with respect to which Seller is a party, a named insured or otherwise the beneficiary of coverage with respect to any of the Purchased Assets or the Assumed Liabilities.

6.16    Tax Matters.

(a)    Seller has filed all Tax Returns, including without limitation all Tax Returns relating to the Purchased Assets and the Business, that are required to be filed before the Closing Date and such Tax Returns have been properly prepared and timely filed and were true, complete and accurate in all material respects;

(b)    Except for the Prepetition Sale Taxes, Seller has fully and timely paid all Taxes due and payable (whether or not shown on any Tax Return, including without limitation all Taxes relating to the Purchased Assets and the Business, and Seller has withheld and timely paid over to the appropriate Taxing authority all Taxes that Seller is required to withhold from amounts paid or owing to any employee, creditor, independent contractor or other third party in compliance with all Tax withholding and remitting provisions of applicable Laws and has complied in all respects with all material Tax information reporting provisions of all applicable Laws;

(c)    Seller has not waived any statute of limitations with respect to any Taxes or agreed to any extension of time with respect to the collection or assessment or reassessment of Taxes due from the Seller for any taxable period and no request for any such waiver or extension is currently pending;

(d)    No audits or administrative or judicial or other proceedings are pending or being conducted or, to the Knowledge of Seller, being threatened with respect to the Taxes due from Seller, no Governmental Body has given notice in writing of any intention to assert any deficiency or claim for additional Taxes against Seller, no claim has been made by any Governmental Body in a jurisdiction where Seller does not file a Return that Seller is or may be subject to Taxation by that jurisdiction, and all deficiencies for Taxes asserted or assessed against Seller have been fully and timely paid or have otherwise been resolved;

(e)    None of the Purchased Assets are subject to any Encumbrance for Taxes (other than Permitted Encumbrances); and

(f)    None of the Purchased Assets are "tax-exempt use property" within the meaning of Section 168(h) of the Code.

6.17    Vendors.  Schedule 6.17 of the Seller Disclosure Schedules represent a true, complete and correct list of the ten (10) largest vendors for the Business as of the Petition Date.

6.18    Transactions with Directors, Officers, and Members.  Seller is not a party to any agreement or arrangement with any of the directors, officers, managers or members of Seller with respect to the Business or the Purchased Assets under which it (i) leases any real or personal property (either to or from such directors, officers, managers, members of Seller); (ii) licenses technology (either to or from such directors, officers, managers or members of Seller); (iii) is

obligated to purchase any tangible or intangible asset from or sell such asset to such directors, officers, managers or members of Seller; (iv) purchases products or services from such directors, officers, managers or members of Seller; or (v) pays or receives commissions, rebates or other payments. No Person owns or has any rights in or to any of the assets, properties or rights to be used by Purchaser with respect to the Business (including the Purchased Assets) in the Ordinary Course of Business.

6.19 Purchaser is a Good Faith Purchaser. Seller has determined that Purchaser is a good faith purchaser for value, and upon information and belief, will be acting in good faith in closing the sale of the Purchased Assets.

<h1 style="text-align:center">ARTICLE 7</h1>

<h2 style="text-align:center">REPRESENTATIONS AND WARRANTIES OF PURCHASER</h2>

Purchaser hereby makes the representations and warranties in this Article 7 to Seller as of the Original Execution Date and as of the Closing Date.

7.1 Organization. Purchaser is a limited liability company, duly organized, validly existing and in good standing under the Laws of Ohio.

7.2 Authority Relative to This Agreement. Purchaser has all requisite limited liability company power, authority and legal capacity to (a) execute and deliver this Agreement, (b) execute and deliver the Ancillary Agreements to which it is a party, and (c) perform its obligations hereunder and under each of the Ancillary Agreements to which it is a party, and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and each of such Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on the part of the Purchaser party thereto. This Agreement and each of such Ancillary Agreements have been duly and validly executed and delivered by the Purchaser party thereto, and this Agreement constitutes, and each of such Ancillary Agreements when so executed and delivered will constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with its respective terms.

7.3 Consents and Approvals; No Violation. Neither the execution and delivery of this Agreement or any of the Ancillary Agreements by the Purchaser party thereto, nor the consummation of the transactions contemplated hereby or thereby, nor compliance by the Purchaser with any of the terms or provisions hereof or thereof, will (i) conflict with or result in a breach of any provision of the certificate of formation, limited liability company agreement/certificate of incorporation, bylaws or other governing documents of the Purchaser, (ii) conflict with or result in a breach of any Law applicable to the Purchaser, or (iii) conflict with, violate, result in the breach or default under any contract to which the Purchaser is a party. Except with regard to matters referenced in the Interim Beverage Management Agreement, the execution, delivery and performance by the Purchaser of this Agreement does not require the Purchaser to make any filing with or give notice to, or obtain any consent or permit from, any Governmental Body.

7.4     Brokers and Finders.  The Purchaser has not employed, and to the knowledge of Purchaser, no other Person has made any arrangement by or on behalf of Purchaser with, any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which could give rise to any claim against Seller and its Affiliates for investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

7.5     Independent Investigation.  Purchaser has conducted its own independent investigation, review and analysis of the Business, the Purchased Assets and the Assumed Liabilities, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of the Seller for such purpose.  Purchaser acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Purchaser has relied solely upon its own investigation and the express representations and warranties of the Seller set forth in Article 6 of this Agreement; and (b) neither the Seller nor any other Person has made any representation or warranty as to the Seller, the Business, the Purchased Assets, the Assumed Liabilities or this Agreement, except as expressly set forth in Article 6 of this Agreement (as qualified by the Seller Disclosure Schedules).

## ARTICLE 8

## EMPLOYEES

8.1     Employees.

(a)     Subject to and in accordance with the provisions of this Section 8.1, Purchaser shall, effective upon the Closing, offer employment to the Employees.  Purchaser shall hire all of the Employees (which may include current management employees) who accept such offer provided, that the offer of employment and hiring shall be on terms and conditions solely determined by Purchaser in its discretion.  Employees who accept such offers and become either full-time or part-time employees of Purchaser, consistent with their employment status with Seller, upon the Closing are hereinafter referred to as "Transferred Employees."  Seller shall use reasonable efforts to assist Purchaser in securing the employment of the Employees.

(b)     The employment of each Transferred Employee by Seller shall end effective as of the close of business on the day before the Closing and the employment of the Transferred Employees by Purchaser shall commence at or after 12:01 a.m. on the day of the Closing.

(c)     Nothing in this Article 8 expressed or implied shall confer any third party rights or remedies hereunder in any Person, including any Employees or Transferred Employees and nothing herein amends any Benefit Plan or any employee benefit plan of the Purchaser.

8.2     Further Assurances.  From time to time after the Closing and without further consideration, Purchaser and Seller, at the request of the other, will execute and deliver such other instruments of conveyance and transfer or other instruments or documents, and take or arrange for such other actions, as may reasonably be required to effect any of the transactions contemplated by this Agreement or to provide any party hereto with the benefits intended to be

conferred and conveyed by this Agreement; provided that, notwithstanding anything to the contrary in this Section 8.2 or any other provision of this Agreement, neither Purchaser nor Seller shall be required to execute any document or take any action that would (i) increase the liability or obligation of the party of whom such document or action is requested beyond that such party would have pursuant to the other provisions of this Agreement, (ii) require or cause the party of whom such action or document is requested to initiate, join in or otherwise become a party to any Legal Proceeding, or (iii) cause such party to incur any material cost or expense that is not already imposed upon it by another provision of this Agreement.

## ARTICLE 9

## COVENANTS AND AGREEMENTS

9.1     Further Agreements.    After the Closing, Seller shall (i) promptly deliver to Purchaser any mail or other communication received by Seller and relating to the Business, the Purchased Assets or the Assumed Liabilities, (ii) promptly transfer in immediately available funds to Purchaser any cash, electronic credits or deposits received by Seller to the extent that such cash, electronic credits or deposits are Purchased Assets, and (iii) promptly forward to Purchaser any checks or other instruments of payment that it receives to the extent that such checks or other instruments are Purchased Assets.   After the Closing, the Purchaser shall (x) promptly deliver to the Seller any mail or other communication received by the Purchaser and relating to the Excluded Assets or the Excluded Liabilities, (y) promptly wire transfer in immediately available funds to Seller, any cash, electronic credits or deposits received by the Purchaser to the extent that such cash, electronic credits or deposits are Excluded Assets, and (z) promptly forward to the Seller any checks or other instruments of payment that it receives to the extent that such checks or other instruments are Excluded Assets.   From and after the Closing Date, Seller shall refer all inquiries with respect to the Business, the Purchased Assets and the Assumed Liabilities to Purchaser, and the Purchaser shall refer all inquiries with respect to the Excluded Assets and the Excluded Liabilities to the Seller.   For the avoidance of doubt, except for the Cash Bid Amount and any other Excluded Asset, any cash or cash equivalent or deposit related to the Business that Seller receives prior to or after the Closing Date are deemed Purchased Assets.

9.2     Preservation of Records; Post-Closing Access to Information.

(a)     The Seller and Purchaser agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the Business, the Purchased Assets and the Assumed Liabilities for at least (2) years after the Closing Date except, in the case of Tax matters, for at least (30) days following the expiration of the period of any applicable statute of limitations and shall make such records available during such time period to the other party as may be reasonably required by such other party in connection with, among other things, any insurance claims by, Actions or tax audits against or governmental investigations of Seller or Purchaser or any of their respective Affiliates, or in order to enable the Seller or Purchaser to comply with their respective obligations under this Agreement or any of the Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby.

(b)     Purchaser shall give the Seller and Representatives of Seller reasonable access, during normal business hours, upon reasonable advance written notice (which notice shall specify the intended use or purpose of such access) and in a manner as would not be unreasonably disruptive to the business or operations of Purchaser or any of its subsidiaries, to Purchaser's offices, facilities, plants, properties, assets, employees and documents that were included in the Purchased Assets pertaining to the conduct of the Business or ownership of the Purchased Assets prior to the Closing Date to the extent necessary for, and solely in order for compiling and filing tax returns.  Purchaser shall, at Seller's expense, use commercially reasonable efforts to cause Purchaser's Representatives to furnish to Seller such financial, technical, operating and other information pertaining to the conduct of the Business or ownership of the Purchased Assets prior to the Closing Date as Seller shall from time to time reasonably request in a written notice (which notice shall specify the intended use or purpose of any such information).  Notwithstanding the foregoing, Purchaser shall not be required to provide any such access, or cause its Representatives to furnish any such information, to the extent that doing so, in the reasonable judgment of Purchaser, would constitute a waiver of the attorney-client privilege.

9.3     Publicity.  Subject to the provisions of the Bankruptcy Code and Seller's right to make such filings and disclosures as it in good faith deems necessary or appropriate in connection with the Bankruptcy Case, except as required by applicable Law, Seller and Purchaser shall not (and shall cause their respective Affiliates not to) issue any press release or make any public statement concerning this Agreement or the transactions contemplated hereby without the other party's consent.

9.4     Further Assurances.  Subject to the terms and conditions of this Agreement, at and following the Closing, each of the parties shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and cooperate and take such further actions, as may be reasonably necessary or appropriate to transfer and assign fully to Purchaser and its successors and assigns, all of the Purchased Assets free and clear of all Encumbrances, and for Purchaser and its successors and assigns to assume the Assumed Liabilities, and to otherwise make effective the transactions contemplated hereby, including but not limited to the transfer of Seller's Liquor Permit to Purchaser, the operation of Purchaser's business at the location of the Business under the Interim Beverage Management Agreement and the associated reporting of sales under Seller's vendor's license, obtaining a sales tax clearance certificate from the Ohio Department of Taxation and the cooperation of Seller and Seller's principals, managing members and officers, as the case may require, relative to the foregoing matters.  Nothing in this Section 9.4 shall obligate any party hereto to waive any right or condition under this Agreement.  This Section 9.4 shall survive Closing.

# ARTICLE 10

# CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATION TO CLOSE

The obligation of Purchaser under this Agreement with respect to the purchase and sale of the Purchased Assets shall be subject to the fulfillment on or prior to the Closing of each of the following conditions, any of which may be waived in writing by Purchaser:

10.1 <u>Accuracy of Representations and Warranties; Performance of this Agreement</u>. Each of the representations and warranties made by Seller shall be true and correct on and as of the Original Execution Date, as of the date hereof (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date) and at and as of the Closing Date, except for any failure to be so true and correct that, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect. Seller shall have complied with and performed in all material respects all of the agreements and covenants required by this Agreement and each other Transaction Document to be performed or complied with by it on or prior to the Closing.

10.2 <u>Officer's Certificate</u>. Seller shall have delivered to Purchaser a certificate executed by an executive officer of Seller (including incumbency certificates) as Purchaser may reasonably request in order to evidence compliance with the conditions set forth in Section 10.1.

10.3 <u>Document Deliveries</u>. Seller shall have delivered to Purchaser the following documents: (a) Bill of Sale, (b) Assumption Agreement, (c) Assignment of Personal Property Leases, (d) Assignment of Real Property Leases, (e) Liquor Permit Transfer Documents (to the extent such documents require Seller's execution) and (f) the Interim Beverage Management Agreement, all as described in Article 3.

10.4 <u>Bankruptcy Matters</u>. The Sale Order shall have been entered by the Bankruptcy Court. All such orders must be in effect and must not have been reversed or stayed or modified in any material respect.

10.5 <u>Required Consents</u>. Purchaser shall have received all Required Consents set forth on <u>Schedule 10.5</u> attached hereto.

10.6 <u>No Material Adverse Effect</u>. Since the Original Execution Date, there shall have been no Material Adverse Effect to the Purchased Assets or the Business.

**ARTICLE 11**

**CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE**

The obligations of Seller under this Agreement with respect to the purchase and sale of the Purchased Assets shall be subject to the fulfillment on or prior to the Closing of each of the following conditions, any of which may be waived in writing by Seller:

11.1 <u>Accuracy of Representations and Warranties; Performance of this Agreement</u>. Each of the representations and warranties made by Purchaser in this Agreement shall be true and correct on and as of the Original Execution Date, as of the date hereof (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date) and at and as of the Closing Date, except for any failure to be so true and correct that, individually or in the aggregate, has not had and would not reasonably be expected to have a material adverse effect on the ability of Purchaser to timely consummate the transactions contemplated hereunder (including having sufficient funds to pay the Consideration and any other payments, fees or expenses contemplated hereby). Purchaser shall have complied with and performed in all material respects all of the

agreements and covenants required by this Agreement and each other Transaction Document to be performed or complied with by it on or prior to the Closing.

11.2     Authorizing Resolutions. Purchaser shall have delivered to Seller copies of the authorizing resolutions of its Board of Directors authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and all instruments and documents to be delivered in connection herewith and the transactions contemplated hereby or thereby.

11.3     Document Deliveries. Purchaser shall have delivered to Seller counterparts of the documents described in Section 10.3 to the extent that Purchaser's execution is required.

11.4     Bankruptcy Matters. The Sale Order shall have been entered by the Bankruptcy Court. The Sale Order must be in effect and must not have been reversed or stayed or modified in any material respect.

## ARTICLE 12

## TERMINATION

12.1     Breaches and Defaults; Opportunity to Cure.  Prior to the exercise by a party of any termination rights afforded under this Agreement, if either party (the "Non-Breaching Party") believes the other (the "Breaching Party") to be in breach hereunder, the Non-Breaching Party shall provide the Breaching Party with written notice specifying in reasonable detail the nature of such breach, whereupon if such breach is curable the Breaching Party shall have ten (10) calendar days from the receipt of such notice to cure such breach to the reasonable satisfaction of the Non-Breaching Party.  If the breach is not cured within such time period, then the Non-Breaching Party's sole remedy shall be to terminate this Agreement if the breach is such that the condition set forth in Section 10.1 or Section 11.1, as applicable, shall not be satisfied (as provided in Section 12.2); provided, however, that the Non-Breaching Party shall not be entitled to terminate this Agreement if it is in material breach of this Agreement.

12.2     Termination. This Agreement may be terminated and the transactions contemplated herein may be abandoned, by written notice given to the other party hereto, at any time prior to the Closing:

(a)     by mutual written consent of Seller and Purchaser;

(b)     by Seller or Purchaser if the Bankruptcy Court enters an Order approving the sale of the Purchased Assets to a third-party purchaser;

(c)     subject to the right to cure set forth in Section 12.1, at any time prior to the Closing Date, by Purchaser if Seller is in breach of any covenant, representation, undertaking or warranty such that the condition set forth in Section 10.1 shall not be satisfied, and Purchaser has not waived such condition in writing on or before the Closing Date;

(d)     subject to the right to cure set forth in Section 12.1, at any time prior to the Closing Date, by Seller if Purchaser is in breach of any covenant, representation or warranty

such that the condition set forth in <u>Section 11.1</u> shall not be satisfied, and Seller has not waived such condition in writing on or before the Closing Date;

(e)     at or prior to the Bankruptcy Court hearing regarding approval of this Agreement, by either Seller or Purchaser, if Qualified Bid is accepted and approved by the Bankruptcy Court;

(f)     by Seller if the Closing shall not have occurred on or before January 31, 2019, unless the failure to have the Closing shall be due to the failure of Seller to perform in any material respect its obligations under this Agreement required to be performed by it at or prior to the Closing;

(g)     by Purchaser if the Closing shall not have occurred on or before January 11, 2019, unless the failure to have the Closing shall be due to the failure of Purchaser to perform in any material respect its obligations under this Agreement required to be performed by it at or prior to the Closing;

(h)     by Purchaser, if for any reason Purchaser is unable to credit bid the Credit Bid Amount pursuant to Section 363(k) of the Bankruptcy Code as provided for herein; or

(i)     by Purchaser, if the Sale Hearing does not occur by December 21, 2018.

12.3     <u>Effect of Termination</u>. In the event that this Agreement is validly terminated in accordance with Article 12, this Agreement shall terminate and each of the Parties shall be relieved of its respective duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Purchaser or Seller, except as expressly provided in <u>Section  12.3(a)</u>; provided, however, that the obligations of the Parties set forth in <u>Section 12.3(a)</u>, <u>Section 14.4</u>, and <u>Section  9.3</u>, and <u>Article 2</u> hereof shall survive any such termination and shall be enforceable hereunder.

(a)  _Expense Reimbursement_.  Anything contained herein to the contrary notwithstanding, if this Agreement is terminated at any time before the Closing or the Seller consummates a transaction pursuant to any Alternative Proposal within twelve (12) months after the Original Execution Date, the Expense Reimbursement shall be due and payable as allowed administrative priority expenses of Seller under Section 503(b)(1) of the Bankruptcy Code upon the earliest to occur of the consummation of any transaction pursuant to an Alternative Proposal, the consummation of a plan of reorganization or plan of liquidation in the Bankruptcy Case, any dismissal of the Bankruptcy Case, and any conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code.

## ARTICLE 13

## DEFINITIONS

13.1  _Certain Definitions_.  As used herein:

(a)  "_401K Plan_" means the 401K retirement plan provided to Seller by Principal Financial Services.

(b)  "_Accounts Receivable_" means all trade accounts receivable and other rights to payment from customers of Seller but excluding the Inter-Company Receivables, and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered to customers of Seller prior to Closing, and any claim, remedy or other right of Seller related to any of the foregoing.

(c)  "_Affiliate_" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

(d)  "_Ancillary Agreements_" means, collectively, the Seller Ancillary Agreements and the Purchaser Ancillary Agreements and each agreement required pursuant to Sections 5.2 and 5.3 herein.

(e)  "_Assignment and Assumption Agreement_" means that certain agreement to effect the assignment and assumption of the Assumed Liabilities.

(f)  "_Assumed Agreements_" means the Assumed Real Property Leases, the Assumed Personal Property Leases, and the Assumed Contracts.

(g)  "_Bankruptcy Code_" means Title 11 of the United States Code, 11 U.S.C. §§ 101— _et seq._

(h)  "_Books and Records_" means all documents used by Seller in connection with, or relating to, the Purchased Assets, the Assumed Liabilities, or the Business, including all

files, data, reports, plans, mailing lists, supplier lists, customer lists, price lists, marketing information and procedures, advertising and promotional materials, equipment records, warranty information, records of operations, standard forms of documents, manuals of operations or business procedures and other similar procedures (including all discs, tapes and other media-storage data containing such information) with respect to the Business.

(i)    "Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in Cleveland, Ohio are authorized or required by Law to be closed.

(j)    "Cash on Hand Amount" means all of Seller's cash or cash equivalents, including cash on hand and in bank accounts, all checks received, whether or not received, deposited or cleared prior to the Closing.

(k)    "Code" means the Internal Revenue Code of 1986, as amended.

(l)    "Contract" means any written or oral contract, indenture, note, bond, lease, license, commitment or instrument or other agreement or arrangement primarily related to the operation of the Business or affecting or related to any of the Purchased Assets or the Assumed Liabilities or by which Seller is bound or by which any property of Seller is Encumbered.

(m)    "Claim" has the meaning given to such term in Section 101(5) of the Bankruptcy Code.

(n)    "Encumbrance" means, to the extent not considered a Lien, any encumbrance, Claim, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, hypothecation, easement, right of way, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement.

(o)    "Environmental, Health and Safety Requirements" means all applicable Laws relating to pollution or protection of human health or the environment, (including, without limitation, ambient air, vapor, surface water, ground water, land surface or subsurface strata, and natural resources), including, without limitation, Laws relating to (i) Releases or threatened Releases of, or exposure to, Hazardous Materials, (ii) the manufacture, processing, distribution, use, treatment, generation, storage, containment (whether above ground or underground), transport or handling of Hazardous Materials, (iii) recordkeeping, notification, disclosure, or reporting requirements regarding Hazardous Materials, (iv) endangered or threatened species of fish, wildlife and plants, and the management or use of natural resources, and (v) the preservation of the environment or mitigation of adverse effects on or to human health or the environment.

(p)    "Equipment" means all equipment, machinery, furniture, fixtures and other tangible personal property of every kind and description and improvements and tooling owned by or primarily used, or held for use, in connection with the operation of the Business, wherever located.

(q)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(r)     "<u>Expense Reimbursement</u>" means all reasonable and documented costs and out of pocket expenses incurred by the Purchaser in connection with this Agreement and the transactions contemplated hereby in an amount not to exceed $100,000.

(s)     "<u>Gift Cards</u>" means that certain type of gift card sold to restaurant customers for the purposes of redemption at the Business.

(t)     "<u>Governmental Body</u>" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature or any self-regulatory agency, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private).

(u)     "<u>Hazardous Materials</u>" means any materials (including a chemical, pollutant, contaminant, or material, waste or substance) that are: (i) prohibited, limited or regulated by the Environmental, Health and Safety Requirements as "hazardous", "acutely hazardous" or "toxic"; (ii) petroleum and petroleum products, by-products, derivatives or wastes; (iii) asbestos or asbestos-containing materials or products; (iii) polychlorinated biphenyls; (iv) lead or lead-based paints or materials; (v) radon; (vi) toxic mold; (vii) radioactive; or (viii) other similar substances that may have an adverse effect on human health or the environment.

(v)     "<u>Indebtedness</u>" owed by Seller or any predecessor of Seller means (i) all indebtedness or other Liabilities or obligations for borrowed money, whether secured or unsecured, including, without, limitation any operating line of credit or capital lease obligations; (ii) indebtedness of the type described in clause (i) above guaranteed in any manner by Seller or in effect guaranteed, directly or indirectly, in any manner by Seller through an agreement, contingent or otherwise; (iii) all capital lease obligations; (iv) all indebtedness of the type described in clause (i) above secured by any lien upon property owned by Seller, even though Seller has not in any manner become liable for the payment of such indebtedness; (v) all interest expense accrued but unpaid, and all prepayment premiums and penalties, fees and charges on, or relating to, any of such indebtedness; (vi) any liabilities or indebtedness of Seller evidenced by a note; (vii) all obligations under any interest rate and currency protection agreement (including any swaps, forward contracts, caps, floors, collars and similar agreements), commodity swaps, forward contracts and similar agreements; and (viii) any Taxes due and payable and any deferred Liabilities for Taxes.

(w)     "<u>Intellectual Property</u>" means all intellectual property of any kind used, or held for use, in connection with the operation of the Business, including the following: (i) trademarks, service marks, trade names, recipes, slogans, logos, trade dress, internet domain names, brand names, and other similar designations of source or origin, together with all goodwill, registrations and applications related to the foregoing; (ii) patents, utility models and industrial design registrations (and all continuations, divisionals, continuations in part, provisionals, renewals, reissues, re-examinations and applications for any of the foregoing); (iii) copyrights and copyrightable subject matter (including, without limitation, any registrations and applications for any of the foregoing); (iv) trade secrets, proprietary processes, formulae, algorithms, models, and methodologies; and (v) computer software, computer programs, and databases (whether in source code, object code or other form).

(x)    "<u>Inter-Company Receivables</u>" means the amount owed to Seller by one or more affiliated companies arising prior to the Petition Date from one or more intercompany transactions in the aggregate amount of Two Million Five Hundred Sixty-Five Thousand Dollars ($2,565,000) as disclosed by Seller in the Bankruptcy Case on its schedule of assets and liabilities (document number 1).

(y)    "<u>Inventory</u>" means all of Seller's inventories (including, without limitation, food supplies, perishable goods) that are used, or held for use, in connection with the operation of the Business.

(z)    "<u>Knowledge of Seller</u>" or "<u>Seller's Knowledge</u>" means the actual knowledge, as of the Original Execution Date and as of the Closing Date, of Brad Friedlander, Peter Vauthy, Marjorie Davis, and Jonathan Gross.

(aa)    "<u>Law</u>" or "<u>Laws</u>" means all federal, state, local or foreign laws, statutes, common law, rules, codes, regulations or ordinances issued, promulgated, enforced or entered by, any and all Governmental Bodies, or other requirement or rule of law.

(bb)    "<u>Leased Real Property</u>" means all the land, improvements, or other interests in real property leased, subleased or licensed by Seller.

(cc)    "<u>Liability</u>" or "<u>Liabilities</u>" means, as to Seller, any debt, adverse claim, liability, obligation, commitment, assessment, cost, expense, loss, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, including all costs and expenses relating thereto.

(dd)    "<u>Liens</u>" means any lien, Encumbrance, pledge, mortgage, deed of trust, security interest, Claim, lease, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, or transfer restriction under any shareholder or similar agreement or Encumbrance.

(ee)    "<u>Material Adverse Effect</u>" means any effect, change, condition, circumstance, development or event that, individually or in the aggregate with all other effects, changes, conditions, circumstances, developments or events has had, or would reasonably be expected to have, a material adverse effect on the Business, assets, operation, condition (financial or otherwise) or results of operation of the Business or the Purchased Assets (excluding the Excluded Assets and the Excluded Liabilities), taken as a whole, other than any effect, change, condition, circumstance, development or event arising from or related to: (i) general business or economic conditions in any of the geographical areas in which the Business operates; (ii) any condition or occurrence affecting the industry in which Seller operates generally; (iii) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (iv) financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (v) the occurrence of any act of God or natural disaster, including any fire, flood, hurricane, tornado, or other weather

event; (vi) changes in Law or accounting rules; (vii) the taking of any action expressly contemplated by this Agreement or any Ancillary Agreement or taken with the prior written consent of Purchaser; (viii) any effects or changes arising from or related to the breach of the Agreement by Purchaser; or (ix) any strike or labor dispute; provided, however, that in the case of the foregoing clauses (i) through (vi), such effects, changes, conditions, circumstances, developments or events shall be taken into account in determining whether any material adverse effect has occurred to the extent that any such effects, changes, conditions, circumstances, developments or events have, or would reasonably be expected to have, a disproportionate effect on the Business (excluding the Excluded Assets and the Excluded Liabilities) or the Purchased Assets relative to other participants operating in the industry in which Seller operates.

(ff) "Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business consistent with past practice during the period immediately preceding the date of this Agreement.

(gg) "PACA" means Section 5(c) of the Perishable Agricultural Commodities Act, 7 U.S.C. § 499e(c)(2).

(hh) "Permitted Encumbrances" means (i) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, materially adversely affect the operation of the Business; (ii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Law); (iii) materialman's, mechanic's, artisan's, shipper's, warehouseman's or other similar common law or statutory liens incurred in the Ordinary Course of Business for sums not yet due and payable and that do not result from a breach, default or violation by Seller of any Contract or Law; (iv) statutory liens for current Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings or the making of appropriate demands, notices or filings; (v) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects with respect to any real property that do not or would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect; (vi) matters that would be disclosed on an accurate survey of the real property that do not or would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect; (vii) any liens shown in any title commitment, report or policy, or otherwise of record that do not or would not reasonably be expected to adversely affect the current occupancy or use of the real property in any material respect; (viii) Encumbrances that will be and are discharged or released either prior to, or simultaneously with the Closing; (ix) such other Encumbrances, title exceptions or imperfections of title as Purchaser may approve in writing in its sole discretion; (x) any Liabilities created by this Agreement or any of the Ancillary Agreements and (xi) the Encumbrances set forth on Schedule 13.1.

(ii) "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(jj)    "Personal Property Leases" means all leases of personal property relating to personal property used by Seller or to which Seller is a party of by which the properties or assets of Seller are bound, in each case relating to the Business.

(kk)    "Prepetition Sales Taxes" means unpaid sales taxes arising prior to the Petition Date, estimated by Seller to be $37,000.

(ll)    "Purchased Ancillary Agreements" means, collectively, each certificate, agreement or document (other than this Agreement) delivered by Purchaser in connection with this Agreement.

(mm)    "Real Property Leases" means the real property lease, sublease, license, concession and other agreement (whether written or oral), including all amendments, extensions renewals, guaranties and other agreements with respect thereto, pursuant to which Seller holds or occupies the Leased Real Property.

(nn)    "Representatives" means, as to any Person, the directors, officers, employees, counsel, professionals, advisors, accountants, agents, contractors and other representatives.

(oo)    "Release" means any release, spill, emission, discharge, leaking, pumping, injection, deposit, disposal, dispersal, leaching or migration into the environment (including, without limitation, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the movement of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

(pp)    "Sale Hearing" means the hearing held by the Bankruptcy Court on the Sale Motion seeking approval of the Sale Order.

(qq)    "Seller Ancillary Agreements" means, collectively, each certificate, agreement or document (other than this Agreement) delivered by Seller in connection with this Agreement.

(rr)    "Seller Disclosure Schedules" means the disclosure schedules which are attached hereto and delivered by Seller.  The disclosures in the Seller Disclosure Schedules shall modify and relate to the representations and warranties in the corresponding section or subsection of Article 6 to which they refer and are intended to qualify such representations and warranties.  The information set forth in one section or subsection of the Seller Disclosure Schedules that is specifically referred to in another section or subsection of the Seller Disclosure Schedules by appropriate cross-reference shall also be deemed to qualify such other section or subsection of Article 6, and the information set forth in one section or subsection of the Seller Disclosure Schedules shall also be deemed to qualify each other section or subsection of Article 6 to the extent that the relevance of a disclosure in one section or subsection of the Seller Disclosure Schedules to another section or subsection of Article 6 is reasonably apparent on its face.

(ss) "Seller Intellectual Property" means any Intellectual Property that is owned by, licensed to, or primarily used, or held for use by, Seller relating to or in connection with the operation of the Business.

(tt) "Seller's Liquor Permit" means collectively following liquor permits issued by the Ohio Department of Commerce, Division of Liquor Control, to Seller: (i) permit #0348454 (Classes D1, D3, D3x and D6), (ii) permit #03484540005 (d/b/a/ Moxie Unit 250 and patio) (Class D5 and D6) and (iii) permit #034845450003 (Class D5 and D6).

(uu) "Tax" and "Taxes" mean (i) any and all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all income, gross income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, production, premium, disability, worker's compensation, utility, windfall profit, environmental, registration, alternative, add-on minimum, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, sales, use and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, in each case imposed by any Governmental Body; (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Governmental Body in connection with any item described in clause (i); and (iii) any Liability in respect of any items described in clauses (i) and/or (ii) payable by reason of contract, assumption, transferee liability, operation of Law, Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law) or otherwise.

(vv) "Tax Return" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

(ww) "Tower" means Tower IV LLC.

(xx) "UCC-3 Termination Statement" means the termination of a Uniform Commercial Code (UCC) financing statement filed with the appropriate state authority in the Seller's place of incorporation for the purposes of releasing a perfected security interest in the Seller's assets.

(yy) "WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar state Law related thereto.

13.2    Additional Defined Terms. The following terms have the meanings set forth in the Sections set forth below:

| Defined Term | Location |
|---|---|
| Actions | Section 6.4 |
| Agreement | Preamble |
| Alternative APA | Section 2.2 |
| Alternative Purchaser | Section 2.2 |

| Defined Term | Location |
|---|---|
| Alternative Transaction | Section 2.1 |
| Assignment of Real Property Lease | Section 3.4 |
| Assumed Contracts | Section 1.1(c) |
| Assumed Liabilities | Section 1.2 |
| Assumed Personal Property Leases | Section 1.1(c) |
| Assumed Real Property Leases | Section 1.1(c) |
| Assumption Agreement | Section 3.2 |
| Assumption of Personal Property Leases | Section 3.3 |
| Assumption of Real Property Leases | Section 3.4 |
| Bankruptcy Case | Preamble |
| Bankruptcy Court | Preamble |
| Benefit Plans | Section 6.13(c) |
| Bid Deadline | Section 2.1 |
| Bill of Sale | Section 3.1 |
| BJRP | Recitals |
| Breaching Party | Section 12.1 |
| Business | Recitals |
| Employees | Section 6.13(a) |
| Cash Bid Amount | Section 4.1(c) |
| Closing | Section 5.1 |
| Closing Date | Section 5.1 |
| Competing Agreement | Section 2.l |
| Consideration | Section 4.1 |
| Credit Bid Amount | Section 4.1(a) |
| Cure Costs | Section 1.4 |
| Employees | Section 8.1(a) |
| Excluded Assets | Section 1.1(b) |
| Excluded Liabilities | Section 1.3 |
| Final Cash Collateral and DIP Order | Recitals |
| Interim Beverage Management Agreement | Section 3.5 |
| Interim Cash Collateral and DIP Order | Section 3.4 |
| Liquor Permit Transfer Documents | Section 3.5 |
| Non-Breaching Party | Section 12.1 |
| Notes | Recitals |
| Original Execution Date | Preamble |
| Overbidder's Deposit | Section 2.1(a)(ix) |
| Permits | Section 6.6 |
| Petition Date | Recitals |
| Post-Petition Indebtedness | Recitals |
| Pre-Petition Indebtedness | Recitals |
| Purchased Assets | Section 1.1(a) |
| Purchaser | Preamble |
| Qualified Bid(s) | Section 2.1(a) |
| Red License Agreements | Section 1.1(c) |
| Registered IP | Section 6.5 |

| Defined Term | Location |
|---|---|
| Sale Motion | Section 2.1 |
| Sale Order | Recitals |
| Seller | Preamble |
| Seller's Costs | Section 4.1(b) |
| Total Indebtedness | Recitals |
| Transaction | Recitals |
| Transferred Employees | Section 8.1(a) |

# ARTICLE 14

## MISCELLANEOUS

14.1 <u>Expenses</u>. Except for the Expense Reimbursement [or any other expenses specifically addressed in this Agreement], each party shall bear its own expenses and costs, including the fees of any attorney retained by it, incurred in connection with the preparation of this Agreement and the consummation of the transactions contemplated hereby.

14.2 <u>Gift Cards</u>.

(a) Seller and Purchaser acknowledge and agree that Gift Cards purchased by any customer prior to the Closing Date are eligible to be used at the Business post-Closing.

(b) Purchaser shall honor any Gift Cards properly sold in the ordinary course of Seller's Business after Closing.

14.3 <u>Non-Disparagement</u>. Seller and Purchaser acknowledge and agree that they will not publicly disparage each other in any form or manner prior to or after the Closing of the sale transaction contemplated herein, and will cause their Affiliates not to do the same; provided however that nothing in the foregoing shall be construed as prohibiting or otherwise restricting a party's good faith actions in giving truthful testimony in a legal or regulatory proceeding.

14.4 <u>Reserved</u>.

14.5 <u>Survival of Representations and Warranties; Survival of Post-Closing Covenants</u>. All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms for up to twelve (12) months after Closing. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate, including any Actions for damages in respect of any breach thereof.

14.6 <u>Entire Agreement; Amendments and Waivers</u>. This Agreement (including the Schedules attached hereto) and the Ancillary Agreements represent the entire understanding and

agreement between the parties hereto with respect to the subject matter hereof. Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each party hereto, or in the case of a waiver, by the party against whom the waiver is to be effective. No action taken pursuant to this Agreement, including, without limitation, any investigation by or on behalf of any party shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

14.7    <u>Counterparts</u>.  For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

14.8    <u>Governing Law</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF OHIO WITHOUT GIVING EFFECT TO CONFLICT OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

14.9    <u>Jurisdiction, Waiver of Jury Trial</u>.

(a)    In connection with any controversy arising out of or related to this Agreement, Seller and Purchaser hereby irrevocably consent to the exclusive jurisdiction of the Bankruptcy Court, or if, and only if, the Bankruptcy Case has been closed, the courts of the State of Ohio and the federal courts of the United States of America located in the Northern District of Ohio will have sole jurisdiction over any and all disputes between or among the parties, whether in law or equity, arising out of or relating to this agreement or any agreement contemplated hereby.

(b)    Each of the parties hereto hereby irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or related to this agreement or the transactions contemplated hereby.

14.10    <u>Notices</u>.  Unless otherwise set forth herein, any notice, request, instruction or other document to be given, provided or furnished hereunder by any party to the other parties shall be in writing and shall be deemed duly given, provided or furnished (i) upon delivery, when delivered personally, (ii) one (1) Business Day after being sent by overnight courier or when sent by facsimile or e-mail transmission (with confirmation of transmission), and (iii) two (2) Business Days after being sent by registered or certified mail, postage prepaid, as follows:

If to Seller:

BJRP, LLC

3355 Richmond Road
Beachwood, Ohio 44122
Attention:  Brad Friedlander
E-mail:  brad@redrestaurantgroup.com

with copies (which shall not constitute effective notice) to:

Richard A. Baumgart
Dettelbach, Sicherman & Baumgart LLC
55 Public Square, 21st Floor
Cleveland, Ohio 44113-1902
E-mail:  rbaumgart@dsb-law.com

If to Purchaser:

TOWER IV LLC
200 Park Avenue, Suite 400
Orange Village, Ohio  44122
Attention:  Sean O'Brien
E-mail:  seanobrien1414@gmail.com

with copies (which shall not constitute effective notice) to:

Ulmer & Berne LLP
1660 W. 2nd St., Suite 1100
Cleveland, OH  44113
Attention:  Michael S. Tucker and Todd A. Atkinson
Email:  mtucker@ulmer.com and tatkinson@ulmer.com

or to such other Persons, addresses or facsimile numbers as may be designated in writing by the party to receive such notice.

14.11  <u>Binding Effect; Assignment</u>.  This Agreement shall be binding upon Purchaser and Seller, and inure to the benefit of the parties and their respective successors and permitted assigns.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchaser (by operation of Law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void.

14.12  <u>Severability</u>.  If any term, condition or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party.  Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely

as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

14.13 <u>Injunctive Relief</u>. The parties agree that damages at Law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement by the parties, and, accordingly, Seller and Purchaser shall be entitled to injunctive relief with respect to any such breach, including, without limitation, specific performance of such covenants, promises or agreements or an order enjoining the other party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement by such party, all without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting bond. The rights set forth in this <u>Section 11.13</u> shall be in addition to any other rights which Seller or Purchaser may have at Law or in equity pursuant to this Agreement.

14.14 <u>Third Party Beneficiaries</u>. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns, any legal or equitable rights hereunder.

14.15 <u>Section 363(b)(1)(A)</u>. Purchaser shall honor and observe any and all policies of Seller in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

14.16 <u>Certain Interpretations</u>.

(a) Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i) All references in this Agreement to Articles, Sections, clauses, parts and Schedules shall be deemed to refer to Articles, Sections, clauses, parts and Schedules to this Agreement unless otherwise specified.

(ii) All Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii) The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(iv) The words "include," includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

(v) When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is

the reference date in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(vi) Any reference in this Agreement to "$" or "dollars" shall mean U.S. dollars.

(vii) Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(viii) The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(b) The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

SELLER:

**BJRP, LLC**

By: _Bel H Full_____

Name:  Brad Friedlander

Title:  Chief Executive Officer

PURCHASER:

**TOWER IV LLC**

By:_____

Name: Joseph E. LoConti

Title:  Manager

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>**SELLER**</u>:

**BJRP, LLC**

By:_____
Name:  Brad Friedlander
Title:  Chief Executive Officer

<u>**PURCHASER:**</u>

**TOWER IV LLC**

By:_____
Name: Joseph E. LoConti
Title:  Manager

**Exhibit A**

**BILL OF SALE**

  **KNOW ALL MEN BY THESE PRESENTS** that **BJRP, LLC,** an Ohio limited liability company ("Transferor"), for good and valuable consideration paid by **TOWER IV LLC,** an Ohio limited liability company ("Transferee"), the receipt and sufficiency of which is hereby acknowledged, does hereby grant, bargain, sell, transfer, assign, and deliver unto Transferee all tangible personal property and inventory owned by Transferor located at 3355 Richmond Road in Beachwood, Ohio 44122 (the "Real Property") and used in the businesses operating under the names "Red, the Steakhouse" and "Moxie, the Restaurant" (the "Businesses"), including specifically without limitation, all appliances, smoke detectors, maintenance equipment, office furniture and furnishings, restaurant furniture and equipment, inventory, and other items of personal property owned by Transferor and used in connection with the operation of the Real Property and improvements thereon, all telephone numbers associated with the Businesses, all assignable contracts and agreements for the Real Property, and the names "Red, the Steakhouse" and "Moxie, the Restaurant" including any website and domain name, if any, for the apartment community and any logo or artwork specific to the land and improvements (collectively the "Property").

  Transferor is the true and lawful owner of the Property and has good right and lawful authority to bargain and sell the same in the manner set forth herein. Transferor hereby covenants that the Property is free from any liens, security interests, and any other encumbrances as of the Effective Date.

  **IN WITNESS WHEREOF**, Transferor and Transferee have executed this instrument to be effective as of January __, 2019 (the "Effective Date").

**TRANSFEROR:**

BJRP, LLC
an Ohio limited liability company

by: _____

Its: _____

**TRANSFEREE:**

TOWER IV LLC
an Ohio limited liability company

by: _____

its: _____

18-15839-aih   Doc 47-1   FILED 11/16/18   ENTERED 11/16/18 17:26:50   Page 42 of 68

**Exhibit B**
**Assumption Agreement**

**Exhibit C**

**ASSIGNMENT AND ASSUMPTION OF
PERSONAL PROPERTY LEASES**

THIS ASSIGNMENT AND ASSUMPTION OF PERSONAL PROPERTY LEASES ("Assignment") is made and entered into as of the _____ day of January, 2019 (the "Effective Date"), by and between BJRP, LLC, an Ohio limited liability company ("Assignor"), and TOWER IV LLC, an Ohio limited liability company ("Assignee").

WITNESSETH:

WHEREAS, Assignor, as seller and debtor in possession under Case No. 18-15839-AIH (the "Case") in the United States Bankruptcy Court for the Northern District of Ohio (the "Court"), and Assignee, as buyer, are parties to that certain Asset Purchase Agreement dated November 16, 2018 (the "APA"), which APA was approved by the Court in the Case in an Order dated December __, 2018.

WHEREAS, the APA provides that the personal property leases, described on Exhibit A attached hereto and made a part hereof (the "Personal Property Leases"), are to be assigned to and assumed by Assignee as part of the sale of Assignor's assets pursuant to the terms of the APA.

WHEREAS, any and all pre-petition defaults by Assignor under the Personal Property Leases, if any, were cured prior to this Assignment and, as of the Effective Date, the Personal Property Leases are in good standing and in full force and effect.

WHEREAS, Assignor desires to assign to Assignee and Assignee desires to assume from Assignor all of Assignor's rights, title, interest and liabilities in, to and under the Personal Property Leases from and after the Effective Date.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1.      Assignment. Subject to the terms of this Assignment and as of the Effective Date, Assignor hereby grants, gives, sells, assigns, transfers, bargains, sets over and conveys to Assignee, its successors and assigns, all of Assignor's rights, title, interest and liabilities in, to and under the Personal Property Leases.  Assignor acknowledges and represents to Assignee that Assignor has made no previous assignment of the Personal Property Leases.

2.      Assumption.  Assignee hereby accepts the foregoing assignment and, in consideration thereof, Assignee will assume the performance of all of the obligations of Assignor arising or accruing under the Personal Property Leases from and after the Effective Date that are to be performed by the lessor named therein on and after the Effective Date in the same manner and to the same extent as if Assignee were the lessee named therein.

3.     <u>Further Documents and Acts</u>.  The parties agree that, at any time and from time to time hereafter, they will, upon request therefore by the other party, sign and deliver such further documentation and take such further actions as are necessary fully to effect the purpose of this Assignment.

4.     <u>Successors and Assigns; Third-Party Beneficiaries</u>.  This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors in interest and assigns.  Nothing contained in this Assignment shall be deemed to confer upon any person, other than the parties hereto, and their respective successors and permitted assigns, any rights, remedies, claims, causes of action or obligations under, or by reason of this Assignment.

6.     <u>Governing Law</u>.  This Assignment shall be construed in accordance with the laws of the State of Ohio.

7.     <u>Counterparts</u>.  This Assignment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all of which shall together constitute one and the same agreement.

[*Remainder of page intentionally left blank*]

IN WITNESS WHEREOF, the parties have caused this instrument to be executed as of the day and year first above written.

**ASSIGNOR:**

BJRP, LLC
an Ohio limited liability company


By: _____

Its: _____

**ASSIGNEE:**

TOWER IV LLC,
an Ohio limited liability company


By: _____
Name: _____
Its: _____

**Exhibit D**

**ASSIGNMENT AND ASSUMPTION OF
REAL PROPERTY LEASE**

THIS ASSIGNMENT AND ASSUMPTION OF REAL PROPERTY LEASE ("Assignment") is made and entered into as of the _____ day of _January, 2019 (the "Effective Date"), by and between BJRP, LLC, an Ohio limited liability company ("Assignor"), and TOWER IV LLC, an Ohio limited liability company ("Assignee").

WITNESSETH:

WHEREAS, Assignor, as seller and debtor in possession under Case No. 18-15839-AIH (the "Case") in the United States Bankruptcy Court for the Northern District of Ohio (the "Court"), and Assignee, as buyer, are parties to that certain Asset Purchase Agreement dated November 16, 2018 (the "APA"), which APA was approved by the Court in the Case in an Order dated December __, 2018.

WHEREAS, the APA provides that the real property leases, described on Exhibit A attached hereto and made a part hereof (the "Real Property Leases"), are to be assigned to and assumed by Assignee as part of the sale of Assignor's assets pursuant to the terms of the APA.

WHEREAS, any and all pre-petition defaults by Assignor under the Real Property Leases, if any, were cured prior to this Assignment and, as of the Effective Date, the Real Property Leases are in good standing and in full force and effect.

WHEREAS, Assignor desires to assign to Assignee and Assignee desires to assume from Assignor all of Assignor's rights, title, interest and liabilities in, to and under the Real Property Leases from and after the Effective Date.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1.      Assignment. Subject to the terms of this Assignment and as of the Effective Date, Assignor hereby grants, gives, sells, assigns, transfers, bargains, sets over and conveys to Assignee, its successors and assigns, all of Assignor's rights, title, interest and liabilities in, to and under the Real Property Lease.  Assignor acknowledges and represents to Assignee that Assignor has made no previous assignment of the Real Property Leases.

2.      Assumption.  Assignee hereby accepts the foregoing assignment and, in consideration thereof, Assignee will assume the performance of all of the obligations of Assignor arising or accruing under the Real Property Leases from and after the Effective Date that are to be performed by the lessor named therein on and after the Effective Date in the same manner and to the same extent as if Assignee were the lessee named therein.

3. <u>Further Documents and Acts</u>. The parties agree that, at any time and from time to time hereafter, they will, upon request therefore by the other party, sign and deliver such further documentation and take such further actions as are necessary fully to effect the purpose of this Assignment.

4. <u>Successors and Assigns; Third-Party Beneficiaries</u>. This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors in interest and assigns. Nothing contained in this Assignment shall be deemed to confer upon any person, other than the parties hereto, and their respective successors and permitted assigns, any rights, remedies, claims, causes of action or obligations under, or by reason of this Assignment.

6. <u>Governing Law</u>. This Assignment shall be construed in accordance with the laws of the State of Ohio.

7. <u>Counterparts</u>. This Assignment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all of which shall together constitute one and the same agreement.


*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties have caused this instrument to be executed as of the day and year first above written.

ASSIGNOR:

BJRP, LLC
an Ohio limited liability company

By: _____

Its: _____

ASSIGNEE:

TOWER IV LLC,
an Ohio limited liability company

By: _____
Name: _____
Its: _____

**Exhibit E**

**INTERIM BEVERAGE MANAGEMENT AGREEMENT**

This Interim Beverage Management Agreement ("Agreement") is made and entered into as of this __ day of January, 2019, by and between **BJRP, LLC**, an Ohio limited liability company ("Permit Owner") and **TOWER IV LLC**, an Ohio limited liability company ("Manager").

RECITALS

The parties hereto desire that the fine dining restaurant businesses conducted by the Permit Owner located at 3355 Richmond Road in Beachwood, Ohio 44122 (the "Property") under the names "Red, the Steakhouse" and "Moxie, the Restaurant" be continued under the management of the Manager during the time required to complete transfer to Manager of (i) permit #0348454 (Classes D1, D3, D3x and D6), (ii) permit #03484540005 (d/b/a/ Moxie Unit 250 and patio) (Class D5 and D6) and (iii) permit #034845450003 (Class D5 and D6) (collectively the "Liquor Permit") issued by the Ohio Department of Commerce, Division of Liquor Control.

NOW THEREFORE, the parties hereby agree as follows:

SECTION 1. TERM OF AGREEMENT

The term of the relationship contemplated by this Agreement shall commence on the _____ day of January, 2019, and shall expire on the earlier of (i) the date on which approval of the above-mentioned transfer of the Liquor Permit is obtained from the Ohio Department of Commerce, Division of Liquor Control; or (ii) eighteen (18) months after Closing, unless sooner terminated by Permit Owner for failure of Manager to perform its duties hereunder.

SECTION 2. DUTIES OF MANAGER

The Manager agrees as follows:

(A)     To take charge of and manage the business and assets previously conducted by the Permit Owner at the Property, in a business-like manner. Manager shall assume all responsibility for the operation of said business and shall be responsible for all expenses incurred during the period of its operation;

(B)     To keep full and correct books of accounting showing all receipts and expenditures received, incurred, or made in connection with the operation of said business;

(C)     To conduct said business in a legal and proper manner abiding by all laws, ordinances, rules, regulations, and directives of any governmental unit having jurisdiction over said business, especially those of the Ohio Department of Commerce, Division of Liquor Control;

(D)     To indemnify and save the Permit Owner harmless from and against any and all loss and liability of whatever nature which may result from or occur from the operation and management of said business, including, but not limited to suspension of the Liquor Permit;

(E)     To pay all federal and state income, unemployment and workers' compensation withholding taxes for any of its employees employed in the performance hereof, and indemnify and hold Permit Owner harmless for same;

(F)     To collect and pay all state sales taxes due from the operation of the business, and indemnify and hold Permit Owner harmless for same; and

(G)     To work collaboratively with Permit Holder for the reporting of sales under Permit Holder's vendor's license until the Liquor Permit has been transferred to Manager as contemplated herein.

SECTION 3.   DUTIES OF PERMIT HOLDER

The Permit Holder agrees as follows:

(A)     To keep the Permit Holder's vendor's license in full force and effect until the Liquor Permit has been transferred to Manager as contemplated herein;

(B)     To work collaboratively with Manager for the reporting of sales under Permit Holder's vendor's license until the Liquor Permit has been transferred to Manager as contemplated herein;

(C)     To cause its principals, managing members and officers, as the case may require, to cooperate with Manager in the transfer of the Liquor Permit and execute such documents are may be reasonably required to effectuate the transfer of the Liquor Permit to Manager;

(D)     To execute and provide to Manager, to be held in escrow, a Request for Sales Tax Clearance Certificate to be filed with the Ohio Department of Taxation after the Liquor Permit has been transferred to Manager;

(E)     To provide such documentation or information requested by the Ohio Department of Taxation from the Permit Holder, as the taxpayer, in order for the Sales Tax Clearance Certificate to be issued to Permit Holder for the benefit of Manager; and

(F)     To promptly provide Manager with the Sales Tax Clearance Certificate when received by the Permit Holder.

SECTION 4. COMPLIANCE WITH LIQUOR LAWS

In the event that Manager is charged with any violations of the Ohio liquor law during the terms of this Agreement, Permit Owner's attorney, at the expense of Manager, shall defend said violation, or violations before the Ohio Liquor Control Commission. In the event of a violation, Permit Owner, at its discretion, may terminate Manager's right of possession pursuant to this Agreement in order to protect the good standing of the Liquor Permit.

SECTION 5. RELATIONSHIP OF PERMIT OWNER AND MANAGER

   Permit Owner is not the employer of Manager and nothing in this Agreement or otherwise shall serve to create an employer-employee relationship between the parties.

   IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in multiple originals, upon the date and place first above written.

          **MANAGER:**

          **TOWER IV LLC**,
          an Ohio limited liability company


          By: _____

          Its: _____


          **PERMIT OWNER:**

          **BJRP, LLC**,
          an Ohio limited liability company

          By:_____

          Its: _____

**Schedule 1.1(a)**
**Purchased Assets**

(1)        Cash on Hand Amount;

(2)        all equipment, machinery or other tangible personal property and any warranty rights or claims associated therewith;

(3)        all Accounts Receivable;

(4)        [Reserved];

(5)        all Permits transferable to Purchaser pursuant to their terms and in accordance with applicable Laws, to the extent listed on <u>Schedule 6.6(a)</u> attached hereto;

(6)        all intellectual property owned by Seller, including but not limited to all domestic and foreign patents, patent applications (regardless of the applicant), trademarks, service marks and other indicia of origin, trademark and service mark registrations and applications for registrations thereof, copyrights, copyright registrations and applications for registration thereof, Internet domain names and universal resource locators (URLs), ingredients, recipes, menus, training manuals, trade secrets, inventions (whether or not patentable), invention disclosures, moral and economic rights of authors and inventors (however denominated), technical data, customer lists, vendor lists, corporate and business names, trade names, trade dress, brand names, know-how, show-how, formulae, methods (whether or not patentable), designs, processes, procedures, technology, source codes, object codes, computer software programs, databases, data collectors and other proprietary information or material of any type, whether written or unwritten (and all goodwill associated with, and all derivatives, improvements and refinements of, any of the foregoing), including the Intellectual Property listed on <u>Schedule 6.5(a)</u> attached hereto;

(7)        all prepaid items and or expenses;

(8)        all books and records related to the Purchased Assets or the Business, including customer or client lists, files, documentation, records and the related documentation;

(9)        all of Seller's right, title and interest in and to all other assets, whether real or personal, tangible or intangible, used by Seller or useful in the operation of the Business;

(10)        all claims, indemnities, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent) related to the

Purchased Assets or the Business (other than those related to the Excluded Assets or the Excluded Liabilities, or claims on insurance policies of Seller);

(11)     all deposits and prepayments held by third parties pursuant to the Assumed Agreements; and

(12)     Inventory

**Schedule 1.1(b)**
**Excluded Assets**

(1)     all Inter-Company Receivables;

(2)     the Cash Bid Amount;

(3)     any Permits that are not transferable pursuant to their terms and in accordance with applicable Laws;

(4)     all Contracts, except for the Assumed Agreements listed on <u>Schedule 1.1(c)</u> attached hereto;

(5)     all claims and actions of the Seller arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code;

(6)     corporate seals, minute books, charter documents, stock transfer records, books and records relating to any of the Excluded Assets or to the organization, existence or capitalization of Seller or required to be retained by Seller pursuant to applicable Law;

(7)     all insurance policies, contracts and coverage obtained by Seller and all rights to insurance proceeds or other Contracts of insurance or indemnity (or similar agreement);

(8)     all rights of and benefits to Seller under this Agreement, the Ancillary Agreements or any other agreements or instruments otherwise delivered, executed or made in connection with this Agreement;

(9)     all utility deposits paid by Seller prior to the Petition Date and rights to the refund of all or any portion thereof;

(10)     copies of all records of Seller relating to the Employees that Seller is required by Law to retain in its possession;

(11)     all rights to refunds of or credits for Taxes of Seller previously paid by Seller prior to the Closing Date;

(12)     all Benefit Plans;

(13)     all defenses, rights of set-off and counter-claims arising out of or relating to the Excluded Liabilities or Excluded Assets;

(14)     all claims of the Seller against its merchant banks for authorized credit card or debit card sales occurring at the Business prior to the Closing Date for which the Seller's merchant banks have not remitted payment to the Seller;

(15)     any adequate assurance deposit under Section 366 of the Bankruptcy Code; and

(16)     all claims, indemnities, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent) against the Seller's directors, officers, insiders, or affiliates as such terms are defined under the Bankruptcy Code.

**Schedule 1.1(c)**
**Assumed Agreements**

**[To be identified pursuant to Section 1.1(c)]**

**Schedule 1.2**
**Assumed Liabilities**

(1)     the Cure Costs, as determined by the Bankruptcy Court, if any, pertaining to the Assumed Agreements assumed and assigned to Purchaser in accordance with this Agreement.

## Schedule 1.3
## Excluded Liabilities

(1)     all Taxes (i) imposed on Seller for any period, or (ii) arising out of or related to the Business or the Purchased Assets for all tax periods (or portions thereof) ending prior to the Closing; provided, that Purchaser may pay any Taxes in its sole discretion;

(2)     except as otherwise addressed in the Agreement, all costs or expenses incurred in connection with, or related to, the administration of the Bankruptcy Case, including all accrued professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors related to the Bankruptcy Case;

(3)     any and all Liabilities to the extent arising out of or related to any of the Excluded Assets;

(4)     all Liabilities of Seller under this Agreement or Seller Ancillary Agreements;

(5)     all Liabilities which may become due or owing under the Assumed Agreements (i) with respect to the period prior to the Closing or (ii) after the Closing but which arise out of or relate to any breach that occurred prior to the Closing, other than any Cure Costs pertaining to the Assumed Agreements;

(6)     all Indebtedness owed by Seller or any predecessor of Seller;

(7)     any claim of any Employee arising out of such Employee's employment by Seller;

(8)     any WARN Act Liability arising on or prior to the Closing Date;

(9)     any ERISA Liability arising on or prior to the Closing Date;

(10)    any Claim arising prior to Closing and not expressly assumed pursuant to this Agreement;

(11)    any Liability to any stockholder or other equity holder of Seller or predecessor of Seller;

(12)    any Liability arising out of or related to any Legal Proceeding commenced or threatened against Seller or any predecessor of Seller;

(13)    any Liability for infringement or misappropriation of any intellectual property arising out of or related to any conduct of Seller or operation of the Business on or before the Closing;

(14) any Liability, whether administrative, civil or criminal in nature, relating to any Liquor License or the sale or service of alcohol beverages thereunder, where the circumstances upon which such Liability is predicated occurred prior to the Closing unless expressly assumed by Purchaser;

(15) any Liability of Seller based upon Seller's acts or omissions occurring before or after the Closing unless expressly assumed by Purchaser; and

(16) all other Liabilities and obligations for which Purchaser does not expressly assume any liability.

**Schedule 6.5(a)**
**List of Seller Intellectual Property**

(i)  Registered IP

      Red the Steakhouse (Registration No. 3,448,609)

      Red the Steakhouse (Registration No. 1,446,608)

(ii) Software

      OpenTable Online Reservations

      Oracle America's Micros Point of Sale System

      Accubar Liquor Inventory System

      Avero Business Intelligence Software

      Windstream Phone

      One View Communications Internet

      Time Warner Cable (Spectrum)

      Pandora DMX

      Quickbooks Accounting Software

      GetLinked Financial Integration Software

      Emails Management (redrestaurantgroup.com and redthesteakhouse.com)

      Hotschedules Online Employee Scheduling Software

      Monitronics / Brinks Alarm System

      Social Media (Facebook and Twitter)

      Websites

(iii) Infringement Causes of Action

      None.

**Schedule 6.6(a)**
**List of Material Permits**

1. <u>Applicable Agency</u>:  Ohio Department of Commerce-Division of Liquor Control

| Permit No. | Permit Name | Class | Date Of Action | Street | City | State | Zip | City/Twp Premises | Agency No. |
|---|---|---|---|---|---|---|---|---|---|
| 0348454 | BJRP LLC dba Moxie | D1, D3, D3x D6 | Issued 9/17/2018 | 3355 Richmond Rd. | Beachwood | OH | 44122 | Beachwood | 00941 |
| 03484540005 | BJRP LLC dba Moxie Unit 250 and patio | D5, D6 | Issued 8/19/2015 | 3355 Richmond Rd. | Beachwood | OH | 44122 | Beachwood | 00941 |
| 034845450003 | BJRP LLC | D5, D6 | Issued 8/19/2015 | 3355 Richmond Rd. | Beachwood | OH | 44122 | Beachwood | 00919 |

2. <u>Applicable Agency</u>:  Ohio Department of Health

License Number:  NFRY-9G57E9
Expiration Date: March 1, 2019
Category/Descriptive: Commercial FSO <25000 sq.ft. – Risk Level IV
Address:  3355 Richmond Road, Beachwood, Ohio 44122

**Schedule 6.10**
**Leased Real Property**

14,172 square feet located at Corporate Park of Beachwood with an address of 3355 Richmond Road, Beachwood, Ohio.

**Schedule 6.11**
**Personal Property Leases**

1.       Capital Lease No: 134724-002, Restaurant Supplies, expiring July 2020

2.       Capital Lease No: 134724-003, Restaurant Supplies, expiring July 2020

**Schedule 6.14(c)**
**Benefit Plans**

1. Medical insurance provided by United Healthcare
2. Dental and vision insurance provided by Principal Life Insurance Company
3. 401(k) Retirement plan provided by Principal Financial Services
4. Paid time off based on years of service

**Schedule 6.15**
**Insurance Policies**

Insurance Policies provided by Liberty Mutual Insurance

1. Commercial Property
2. Commercial Inland Marine
3. Commercial Crime
4. Commercial General Liability
5. Liquor Liability
6. Employee Benefits Liability

Insurance Policies provided by Travelers Casualty and Surety Company of America

1. CyberRisk
2. Employment Practices Liability

**Schedule 6.17**
**Top 10 Vendors**

1. Sysco Food
2. Blue Ribbon
3. Catanese
4. Chef2chef
5. Premier ProduceOne
6. Heidelberg Distributors
7. Dave's Supermarket (liquor)
8. Dean Supply
9. Morgan Supply
10. State Cleaning

**Schedule 13.1**
**Permitted Encumbrances**

<u>Active Leased Tangible Personal Property</u>

1. Susquehanna Commercial Finance, Inc. – Financing Statement #: OH00187531382

2. Lease Corporation of America Equipment Lease – Financing Statement #: OH00187531271